## BLACK POINT S. S. CO. v. READING CO.

## READING CO. v. BLACK POINT S. S. CO.

### Nos. 628, 633.

District Court, D. Massachusetts.
March 20, 1936.

Putnam, Bell, Dutch & Santry, of Boston, Mass., for Black Point S. S. Co.

Choate, Hall & Stewart, James Garfield, and Bailey Aldrich, all of Boston, Mass., for Reading Co.

## McLELLAN, District Judge.

These two libels involve the same facts and were heard together. The first seeks to recover for damage to the S. S. Black Point due to a collision between that vessel, owned by the libelant, and the barge Glenside, then owned by the libelee. The second libel by the then owner of the barge Glenside seeks recovery for damage caused to that barge as a result of the same collision.

The collision occurred in Boston Harbor in the dredged channel at or near the entrance to President Roads on the evening of September 22, 1931, at about 8:44 daylight saving time. The night was clear, with a moderate westerly breeze. The tide was flowing at about one-half knot. Some of the testimony as to times was given in terms of Daylight saving time and other testimony in terms of Eastern standard time, but, for convenience and clearness, all times mentioned in this opinion are Daylight saving time, which was in effect on the date of the collision here involved.

On the evening of September 22, 1931, the tug Valley Forge had come up the harbor with the barges Tulpehocken and Glenside in tow. She and her tow passed Deer Island Light about 8:15, going half speed, or about 3 knots. Just after passing Deer Island Light, and at about 8:20, the tug gave the order to shorten hawser, and about 8:30 the order to drop hawser. The speed of the tug and tow at this time was about 2 knots. The tug then began maneuvering on the extreme north side of the channel to make fast to the Tulpehocken and bunch the tow. The barge Glenside, free of the other barge and the tug, came along under her own way, a little to its port of the center of the channel, not as far up the channel as the tug, and 500 or 600 feet away from it. There was evidence, and I find, that it is customary for tows to be bunched before entering the channel when conditions permit, and, though there were no conditions of weather or tide which prevented it, that was not done in this case.

The steamship Black Point, a collier in the coastal trade, left the Metropolitan coal dock in Chelsea at 7:55, and proceeded down the harbor at varying speeds and courses. The captain, when some distance away, saw the Valley Forge and the Tulpehocken on the north side (or his port side) of the channel. He also saw a vessel which later turned out to be the Glenside coming up the channel near the center, somewhat to his starboard. So far as he could discern when he first saw it, this boat had a green side light and some white lights showing, and he believed it was a small gasoline boat. The Black Point's speed was about 5½ knots and her position about the center of the channel. He blew one whistle to the tug, by which he meant that he proposed, unless he heard something to the contrary, to keep his course, passing the tug port to port and later the Glenside starboard to starboard. There was no answering whistle from the Valley Forge. Thereupon the tug, which had been displaying red and green side lights and one white mast head light, turned on another white light under the one already there. This was done when the tug made fast to the Tulpehocken, and was proper. The captain of the Black Point then saw that the Glenside had two white lights in a horizontal line on the

stern, which indicated that it was the stern barge in a tow. The captain of the Black Point testified, and I find that he then thought the tug or the Tulpehocken had a line out to the Glenside, that to proceed on his course would involve the probability of fouling the hawser and the possibility of serious damage to his own and the other vessels, and that, if the tug had answered his whistle with one blast, or had not flashed on the extra light, or had flashed on the light and answered with one blast, he would have proceeded across her bow and between the tug and the Glenside. He put his engines full speed astern and the helm hard to port in an attempt to swing the ship to the right, pass ahead of the barge, and thus go clear. The Glenside was coming up the channel all the time, though by this time she had very little, if any, way on her other than that caused by the tide. When the Black Point's captain found he could not clear, he turned his wheel hard to starboard and his engines full ahead in an attempt to throw the stern clear. Then the Black Point had no headway, and the Glenside struck her about 20 feet aft of midships.

It is agreed that President Roads is a narrow channel and comes under the rules provided for inland waters.

The Reading Company contends, as I understand it, that such fault as may be found to have existed on the part of the Valley Forge and the Glenside was not the proximate cause of the collision, and that the Black Point was solely responsible. In this contention I am unable to concur.

The tug, after entering a busy channel, proceeded to bunch her tow. The stern barge, then free of any hawser and out of control, was permitted to stray beyond the center and 500 or 600 feet away from the rest of the tow in the direct path of vessels coming down the channel. The Glenside was carrying lights indicating that she was the stern barge in a tow, which was not the fact. The Valley Forge made no reply to the signal of the Black Point. It was argued that the Valley Forge was not an approaching vessel, and that therefore she was not bound to answer the Black Point's signal. I find that she was an approaching vessel. The rules provide that a vessel is "under way" when she is not at anchor, or made fast to the shore, or aground. She was carrying running lights and was maneuvering. The Black Point was correct in considering her as an approaching vessel and signaling to her as such, and she was at fault in not answering the signal. I find that the Glenside and the Valley Forge were both at fault and that their fault was the operative cause of the collision.

The question remains whether there was any contributory fault on the part of the Black Point. She was not on the starboard side of the channel in compliance with the starboard hand rule. But the violation of this rule was a mere condition and not a contributing cause of the collision. The Syosset (C.C.A.) 71 F.(2d) 666. The evidence clearly showed that, had she proceeded on her course and gone by the Valley Forge port-to-port and the Glenside starboard-to-starboard, there would have been no collision.

The Reading Company contends that the signal blown to the Valley Forge meant that the Black Point was going to its starboard around the Glenside, but there is little to this contention, because, at the time the signal was given, there were not such lights on the Valley Forge as to indicate that she had the Glenside in tow. Since the Valley Forge was the nearest approaching vessel and carried no towing lights at the time the signal was given, obviously the Black Point's signal was for the purpose of establishing a port-to-port passing agreement with her. Had the Valley Forge assented to this, the Black Point could then have established a starboard-to-starboard passing agreement with the Glenside. Or, if the Valley Forge had signaled dissent at the time the Black Point's signal was given, there would then have been time for the Black Point to change her course and go clear, or to have stopped until some agreement had been established.

Article 18, rule 3, of the Pilot Rules (Inland Rules), 33 U.S.C.A. § 203, provides in substance that, if either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle. It is true that no danger signals were given by the Black Point, but there was no doubt on her part until the moment she attempted to change her course, and her failure to give the signals at that time did not contribute to the happening of the collision.

46

The situation of apparent danger in which the Black Point found herself was one created by the fault of the Valley Forge and the Glenside, as before indicated. Believing, and reasonably so, that she was in danger, though no actual danger would have resulted from continuing on her course, I find nothing in the conduct of the Black Point thereafter which might be considered to constitute a fault. Her captain did what seemed best to him to avert the likelihood of injury to his and the other vessels, in the light of the situation as it appeared to be. Where definite fault on the part of one vessel (or in this case two) is established, "any doubts regarding the management of the other, or the contribution of her faults, if any, * * * should be resolved in her favor." The Delaware (C.C.A.) 66 F.(2d) 467, 469; The District of Columbia (C.C. A.) 74 F.(2d) 977.

It follows that the Valley Forge and the Glenside were at fault, that their fault was the sole operative cause of the collision, and that the Black Point is exonerated.

Of the Reading Company's requests for rulings, the eleventh is granted, and the others, so far as they are inconsistent with this memorandum, are denied.

The libel of the Reading Company in case No. 633 is to be dismissed.