## THE BARBARA.

## THE ANTONINA.
### Nos. 1069, 1105.

District Court, D. Massachusetts.
June 27, 1945.

Nathan W. Thompson, of Portland, Me., and Thomas H. Walsh, of Boston, Mass., for Leo C. Pyne.

William J. MacInnis, of Gloucester, Mass., for Benedetto Randazza, and the Antonina.

Harry Kisloff, of Boston, Mass., for John P. Madruga, Salvatore Arcoleo, Guy Ciamataro, Mercurio Ciamataro, Serafino Favazza, Peter J. Lovasco, Philip Parisi, Salvatore Randazzo, Seraphino Randazzo, Joseph Zappa, Frank Favazza, John Frontero.

FORD, District Judge.

■ In these proceedings Leo C. Pyne, owner of the Barbara, petitions for limitation of liability; Benedetto Randazza, owner of the Antonina, petitions for limitation of and exoneration from liability. At the hearing the proctor for all the claimants who had appeared and made claims assented to the allowance of the petition of Leo C. Pyne. The court, however, took all the evidence offered with respect to the issues involved therein, and, independently of the concession, reaches the conclusion that although the Barbara was clearly at fault, privity or knowledge of the fault on the part of the petitioner Pyne was lacking.

The questions involved in the petition of the Antonina remain.

The facts are as follows:

During the night of May 18, 1944, a dark, clear night with a light northerly wind and no moon, at approximately 11:20 p. m., the Antonina and the Barbara, two fishing vessels, collided opposite Butler Flats in a north-south channel leading to the port of New Bedford, Massachusetts.

The Antonina, a wooden schooner of forty-five gross tonnage, cast off from State Pier at New Bedford at 11:00 p. m. on said date and proceeded southerly. She was sailing through the channel at eight knots, or three-fourths speed, bound for Dumpling Rocks and Hen and Chicken Lightship, which are in a southwesterly direction from the southern end of the channel, and had passed almost through the channel when the collision occurred. The Barbara's bow struck the Antonina amidships—just forward of the pilot house—on the port side, and the Antonina sunk just east of mid-channel where the channel, of almost uniform width from one end to the other, is three hundred feet wide. At the

time of the accident Captain Randazza of the Antonina was in the pilot house; Madruga, his engineer, was in the engine room; Ciamataro, another crewman, was aft letting out the seine boat; and Parisi, the Antonina's lookout, was allegedly in the bow. The remainder of the crew, nine in number, was in the forecastle, presumably asleep.

The Barbara, a vessel of thirty-five gross tonnage, left Georges Banks at 2:45 a. m. on the date of the collision to return to New Bedford after a fishing expedition. At the time of the accident she was sailing northerly at a speed of seven to seven and one-half knots, or seven-eighths to fifteen-sixteenths of her normal speed. The Barbara was piloted by Captain Kohler, who was in the pilot house at the time of the collision. Swain, the Barbara's watch, and Thomas, the cook, were forward. Thomas was standing on the dog house, and Swain was by the companionway, ten to twelve feet aft of the bow. The only light the Barbara displayed during the night in question was a common standard lantern which was forward, hanging from the jumbo stay five to six feet above the deck. At dusk the Barbara's lights had been found not to function, and when attempts to repair them had failed, Captain Kohler ordered a lantern tied forward. The Antonina, on the other hand, had all the required running lights illuminated from 11:00 p. m. to the time of the accident.

The Antonina measures over all seventy-two feet long and seventeen feet wide, and is equipped with a one hundred twenty horse power Cooper Diesel engine with its controls in the engine room. The pilot controls the motor by means of bell signals which are sent from the pilot house to the engine room. The pilot house is forty feet from the bow, and is situated behind a five-foot high dog house which obstructs the view of the pilot looking through the center window of the pilot house with respect to the water ahead, but leaves his view through the starboard and port window unimpeded.

According to Captain Randazza's testimony, the Antonina was proceeding southerly on a straight course through the channel just right of center. Somewhere between number five and three can buoys (a distance approximately one-half to one mile from the point of collision) he testified he passed the inward bound Wanderer, port to port, the vessels passing forty to fifty feet apart. As he reached Butler Flats, he looked out the starboard window of the pilot house at the flashing white light on Butler Flats, whose interval is five seconds; then he looked out the port window whereupon he saw a spar on the mast of the Barbara sixty feet ahead heading for the Antonina just forward of her foremast, about eighteen feet aft of her bow. Instantly, Randazza signalled Madruga to throw the engine out of gear, and gave the Antonina a three-quarter starboard rudder. The Antonina veered to starboard, and then the collision occurred. The Barbara, however, continued on and pushed the Antonina for about seven minutes in a semi-circular course toward a flashing red buoy on the opposite shore. When the Antonina sunk, her bow was pointed northwards toward New Bedford, and she was at about mid-channel, south of the point of collision. Captain Randazza just prior to the accident got no warning from Parisi, whom he saw at all times forward after leaving State Pier, or anyone else; he saw no lantern light, heard no signal blasts, and was unaware of the approaching Barbara until he saw the spar. Captain Randazza also testified that as he boarded the Barbara he noticed a dirty lantern hanging from the jumbo stay.

Parisi, a fisherman at sea since 1927, standing watch aboard the Antonina at the time of the collision, testified he was in the bow of the Antonina at all times since she left State Pier to the time of the accident, and that he saw no sign of the Barbara, nor was he aware of her presence until she struck the Antonina. Captain Randazza, as stated above, also testified that Parisi was forward at all times.

Ciamataro, a fisherman aboard the Antonina, who was aft behind the pilot house at the time of the accident letting out the seine boat, testified that when the boat first left port he was at the bow talking to Parisi, but later went aft; that he talked to the engineer for a short time prior to the accident, and was astern alone when the accident occurred. He also testified that he heard no whistle prior to the accident and that the Antonina was on the west side of the channel when the accident occurred.

Madruga testified he was below at all times after the departure from State Pier to the time of the accident; that four to five minutes before the collision he went for approximately two minutes to the companionway, leading from the engine room

to the deck, where he heard two unidentified men conversing on the deck at the stern. He returned to his engine, and while oiling the valves, he received a signal to throw the motor out of gear, which he did. Soon thereafter the crash occurred.

Captain Kohler testified he saw the Antonina's lights when she was two miles distant from the Barbara, and that as he entered the channel heading for the flashing red buoy on the east side of the channel, he saw by the relationship of the channel buoy lights with those of the Antonina that the Antonina was approaching on the wrong side of the channel. When he was two hundred yards away, his course was such that he would have passed the Antonina starboard to starboard if he had proceeded straight ahead; however, according to his testimony, he turned the Barbara a little to port to ensure a safe passage, signalled two short blasts, and attempted to pass starboard to starboard. He got no response. Later, he saw the red running light aboard the Antonina flash across his bow, and was quite certain he was going to hit her; however, he made hard to starboard in an attempt to pass safely port to port; but it was too late, and the collision occurred. He further testified that he did not slow down until after the collision and that at that time his motor was turning. The Antonina, he stated, was pushed very little, if at all, and she sank where she was hit. He also testified the lantern aboard the Barbara was clean.

Both Swain and Thomas testified they saw the Antonina when she was at least one-fourth mile distant from the Barbara, that they heard the two blasts, and that the Barbara, having slowed down directly after the collision, pushed the Antonina very little. Swain's testimony was that the Barbara first went to port and then when the ships were eighteen to twenty feet apart, to starboard. With regard to the locus of the collision Swain testified it was at mid-channel, but he was not sure, and Thomas stated it was in the eastern side of the channel.

Very important testimony, that of Michael Gonsalves, skipper on the Wanderer, was introduced in evidence by way of deposition. Captain Gonsalves stated in part: "On May 18, 1944, about midnight, the Wanderer was sailing into New Bedford and I was in the wheelhouse on deck. As we were passing Butler's Flat light we passed the Antonina port to port. She was on her right side of the channel and I was on my right."

It is the contention of the claimants that on this evidence a finding should be made that the Antonina was at fault in two main particulars: (1) she was on the wrong side of the channel, and (2) Parisi, the watch aboard the Antonina, was not at the bow of the Antonina at the time of the collision but was aft conversing with Ciamataro, and his failure to perform his duty as watch was partly the cause of the collision.

I find as a fact that both the Antonina and the Barbara at the time of the collision were on the western side of the channel. All the circumstances of the case point to this conclusion. The testimony of Captain Kohler that the Antonina was on the eastern side of the channel as she came toward the point of collision may be disregarded. In fact, I had no confidence whatsoever in his testimony. I was not impressed with his testimony as to how he determined the Antonina was on the wrong side of the channel. I believe he miscalculated the position of the Antonina, and this circumstance was the primary cause of the collision. The decisive testimony supporting the fact the Antonina was on her starboard side of the channel as she proceeded was that of the captain of the Wanderer. It is hardly probable that the Antonina, which when one-half to one mile away from the scene of the collision was on her right side of the channel, was proceeding on her port side of the channel at the time of the collision. There was no adequate reason for such an eventuality. The fact the Antonina sank about mid-channel is not at all inconsistent with the finding she was on the western side of the channel before the collision occurred, as I find it to be a fact she was pushed a considerable distance by the Barbara whose bow struck the Antonina on the latter's port side and pushed the Antonina in a semi-circular course, causing the Antonina's bow to point, after the collision, toward New Bedford. The point of impact, the facts that the Barbara did not slow down and her engine was still running, the Barbara's speed, and the position of the Antonina after the collision, evidence the fact that the Antonina was pushed some distance.

■■ Common sense compels this court to find the Barbara had a reckless disregard for the rights of other vessels as she proceeded toward New Bedford Har-

bor. She was plainly at fault, proceeding without required lights. Unless the Antonina was clearly at fault, any doubt should be resolved in the Antonina's favor. General Seafoods Corporation v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117, 119.

■ Further, it is plain here that the grievous fault of the Barbara was a sufficient cause of the collision even though the Antonina was at or slightly to the east of mid-channel. There was ample room for the Barbara, whose captain saw her two miles away and knew his ship might not be seen by the Antonina, to pass port to port and thus avoid a collision. Why Captain Kohler did not do this is hard to explain except on the theory, as stated above, he miscalculated the position of the Antonina. Cf. Black Point S. S. Co. v. Reading Co., D.C., 14 F.Supp. 43, affirmed 1 Cir., 87 F.2d 1014.

Captain Randazza could hardly be expected under the circumstances to see the Barbara's lantern light before he did. The lantern was too low for him to see it over the Antonina's dog house. Moreover, this flickering lantern light, flickering from the motion of the Barbara and whatever northerly wind was blowing, was not too easy to distinguish. Nor could it be expected that a reasonably prudent skipper who saw the lantern light under such circumstances would judge that such a light indicated the presence of a vessel proceeding toward him. The lantern light might have indicated a great many stationary objects, e. g., a boat at anchor, or a buoy.

Another important consideration: Kohler, the Barbara's captain, who knew the danger to which he was likely to subject other vessels without his lights, testified he expected to meet no other vessels. In this state of mind it is not surprising he sailed toward the harbor on the wrong side of the channel. It is rather difficult to picture a more careless master of a boat with all the opportunity necessary to determine the position of the Antonina and with space aplenty to pass her port to port, making no attempt to do so until it was too late. That the Barbara swung to port just before the collision is another indication that Captain Kohler, who had seen the Antonina for some distance, made very little effort to avoid a collision with the Antonina until a collision was imminent.

Nor do I think the Antonina was in any way at fault after she found herself in a position of apparent danger. Captain Randazza saw the Barbara only sixty feet away and hardly more than a second elapsed thereafter before the collision. Immediately after seeing the spar, he threw his motor out of gear to slow down the Antonina and thus minimize the force of impact should a collision occur, and gave her a three-quarters starboard rudder in an attempt to avoid a collision. I find he did all that any reasonable captain would be expected to do under the circumstances to avoid a collision.

■ The claimants' second contention, that the lookout Parisi was aft at the time of the collision and that his failure to see the Barbara was a contributory cause of the collision, is not supported by the preponderance of the evidence. The witness Madruga, a claimant, was relied upon in the main to support this contention. As is set forth above, he said he heard two voices. However, he failed to identify them, and since there were others in the crew of the Antonina, it could well have been another member of the crew talking to Ciamataro. I conclude the respondents have not supported the contention that Parisi was at the stern of the Antonina at the time of the collision. The flimsy circumstantial evidence upon which the claimants rely does not justify the finding the court is asked to make. The evidence is too meager. I find, as Parisi and Captain Randazza testified, that Parisi was at the bow of the boat at the time of the collision and was performing his duties as a lookout; and I cannot find he was derelict in the performance of that duty. It is not necessary to repeat what has already been said with respect to Captain Randazza's failure to discover the Barbara approaching. Other than the presence of the dog house the same considerations are present as respects Parisi. Even though a lookout should be held to a high degree of vigilance, I cannot find that Parisi failed to see what an ordinarily careful and competent lookout would have seen under the circumstances. The failure to see what was unquestionably a flickering light from a dirty lantern located six feet above the Barbara's deck cannot be said to constitute fault. I do not believe that the Captain of the Barbara gave any blast signals before the collision occurred. With these findings in view, even if it be assumed that Parisi was not at his post, it could not be said that a failure on the part of the

Antonina to provide a lookout could have contributed in any way to the collision.

### Conclusion.

I find the claimants have failed to sustain their burden of showing by a fair preponderance of the evidence, the John H. Starin, 2 Cir., 191 F. 800; The Suduffco, D.C., 33 F.2d 775; The Linseed King, D. C., 24 F.2d 967, 970, that the Antonina was at fault. On the contrary, I find the evidence adequate to warrant the determination that the Antonina was not at fault, and the sole cause of the collision was the fault of the Barbara.

The Antonina is exonerated. The petition of the Barbara for limitation of liability is allowed.