## THE CETUS.

(Circuit Court of Appeals, Second Circuit. January 13, 1913.)

### No. 94.

COLLISION (§ 95*)—STEAM VESSELS MEETING—FAULT.

A barge on the starboard side of the tug Arnott, passing up the Hudson river on a clear evening from 300 to 500 feet off the New York piers, with another tug and tow between, came into collision with the steamer Cetus coming down. When the vessels were a quarter of a mile apart, practically head on, one of the two, which the evidence tended to show was the Cetus, gave a signal for passing starboard to starboard, which was assented to. Held, that the Cetus was in fault for giving such signal, a port and port passing being required under the circumstances; that the tug was not in fault for agreeing to such signal, with the other vessel so close;' but that a finding by the trial court, which heard the testimony, that she was in fault for not sooner changing her course in compliance with the agreement, would not be disturbed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*

Collision, signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York; Van Vechten Veeder, Judge.

Suit in admiralty for collision by Ferdinand Gildersleeve, Oliver Gildersleeve, and Alfred Gildersleeve, copartners as S. Gildersleeve & Sons, owners of the barge Elheurah, against the steamboat Cetus; the Iron Steamboat Company, claimant. Decree for claimant, and libelants appeal. Reversed, with directions for decree for half damages.

A decree of the District Court for the Southern District of New York dismissed the libel filed by the owners of the barge Elheurah for damages alleged to have been caused by the negligence of the steamboat Cetus in colliding with the barge in the Hudson river at about 8 o'clock on the evening of August 31, 1908. The testimony was not taken until January, 1912. The collision occurred about 500 feet off the New York shore and in the vicinity of the New Jersey Central Ferry slip.

Samuel Park and Carpenter & Park, all of New York City, for appellants.

Conrad Saxe Keyes and Wingate & Cullen, all of New York City, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. The collision occurred in the Hudson river about 8 o'clock on a bright, clear August night, the tide being the last of the ebb. There was little or no wind and nothing in the elements to make navigation hazardous. It cannot be said that a collision occurring, in such circumstances, between vessels visible to each other a mile and a half distant, is either inevitable or inscrutable. Either one vessel is at fault or both vessels are at fault. The Arnott came around the Battery from the East River, having in tow a barge on each side. The Elheurah was a scow 120 feet in length and 27 feet beam, and was without a rudder. She was on the tug's starboard side. The barge Keeler was on her port side. The regulation lights were displayed on tug and tow. Their speed was about 4 miles an hour. The Cetus is an iron, side-wheel passenger steamer plying in summer between New York and Coney Island. She is 216 feet long and 50 feet beam and on the evening in question was making from 12 to 15 miles per hour. The Cetus was bound for Pier 1, North River, and the Arnott for Weehawken, N. J.

It is impossible to tell the exact distance the vessels were from the New York piers but it was probably somewhere between 300 and 500 feet. Coming up the river nearly abreast of the Arnott was a Lehigh Valley tug and tow close in to the pier line and between the Arnott and the docks. The master of the Cetus testified that as he approached the Arnott there was only about "20 or 30 feet" between her tow and the Lehigh Valley tug. The testimony is as follows:

"Q. I mean the opening between the two you had to go between? A. That is what I mean, that was the reason why I stopped, because I saw there wasn't room."

When the vessels first saw each other they were approaching upon opposite courses, both the red and green lights of each were visible from the other; they were end on or nearly so. The rule in such cases is clear that the vessels should pass port to port and must indicate their intention of doing so by exchanging one-blast signals. Had they followed the rule of the road and turned to the right, there would have been no collision. When, therefore, we have discovered who inaugurated a departure from this obviously safe course, we will have gone far in finding who was primarily responsible for the collision. It is impossible to reconcile the testimony on this question as the crew of each boat insist that the other gave the first two-blast signal. We must, therefore, have resort to the presumptions drawn from undisputed facts and endeavor to ascertain which vessel was to be benefited by departing from the usual course.

It is not pretended that the Arnott had anything to gain by the change. She was proceeding up the river on a course a little nearer the piers than the Cetus and only a slight starboarding of her helm was necessary to enable the vessels to pass port to port in safety. What advantage could she gain by turning towards the middle of the river, when she was bound for Weehawken and could have passed port to port without deviating perceptibly from her course?

The Cetus, on the other hand, had everything to gain from the maneuver; unless she passed the Arnott on her starboard side she could not make Pier 1, for which she was destined. Her master testifies:

"It was ebb tide and we had to pull straight for the tide, to make the pier. * * * Q. In order to make your landing at Pier 1 you would have had to go on the Manhattan side of the Arnott and turn out? A. We would have had to go inside. Q. And you had to pass her on her starboard side in order to get in to your pier? A. Yes, sir. Q. You couldn't pass her on your port side? A. Not and make the landing."

We have, then, a strong motive on the part of the Cetus for giving the two-blast signal, and no reason at all for doing so on the part of the Arnott. In such circumstances we cannot resist the conclusion that the Cetus initiated the maneuver which caused the disaster.

But it is said if it were a fault for the Cetus to blow two blasts, it was equally a fault of the Arnott to assent by blowing two in return. We cannot give an unqualified assent to this proposition. It must be remembered that the vessels were very close, probably about a quarter of a mile, and were approaching each other at the rate of about 18 miles per hour. The Arnott was incumbered by an unwieldy tow; she was making only about 4 miles an hour and could not maneuver quickly. The Cetus was a fast passenger steamer, easily and quickly handled. The dilemma which confronted the Arnott was one that had to be promptly met; there was no time for deliberation. Should she agree to the proposal of the Cetus, or take the responsibility of refusing to do so by giving the succession of rapid blasts provided for by rule 3, thus causing delay and the necessity for a new convention? It seems to us that the master of the tug had a right to rely upon the ability of the Cetus to carry out the proposed program safely. She knew of the position of the Lehigh Valley tug and unless she could pass between her and the Arnott or between her and the

piers, she should not have given the two-blast signal. The Arnott had a right to assume that the Cetus understood the situation and could perform the maneuver successfully. We think the Arnott cannot be charged with negligence in answering the two-blast signal.

Even after the danger was imminent, it might have been averted if the Cetus had immediately stopped and reversed, instead of porting her helm.

The District Judge finds that the Arnott was in fault for not starboarding her helm in accordance with the agreement. He says: .

"The Arnott, on the other hand, does not appear to have done so until it was too late to avoid collision, although she ·had ample time and space to do so."

There is testimony to support this· finding and we are not disposed to disturb it, although the master of the Arnott testified:

"Q. Did you keep your course up the river? A. Yes, until she blew us two whistles. Q. Then what did you do? A. I answered the two whistles and put our wheel hard-a-starboard and also told the captain of the barge Keeler to put his wheel hard-a-starboard."

However, the District Judge had the benefit of seeing and hearing a majority of the witnesses and his finding upon disputed facts should be accepted. Owing, undoubtedly, to the fact that the testimony was taken over three years from the date of the collision, it has been almost impossible to arrive at a definite conclusion as to the sequence of events and the location of the vessels, and we have therefore been compelled to rely upon presumptions drawn from admitted facts.

The decree is reversed with costs of this court to the appellants and the cause is remanded to the District Court ·with instructions to enter a decree in favor of the libelants for half the damages and costs.