**THE RICHARD J. BARNES.**

**THE GEORGE A. KEATING.**

**ERIE & ST. LAWRENCE CORPORATION v. REPUBLIC TRANSP. CO., Inc.**

**REPUBLIC TRANSP. CO., Inc., v. ERIE & ST. LAWRENCE CORPORATION.**

Nos. 250, 251.

Circuit Court of Appeals, Second Circuit.

April 15, 1940.

Earle Farwell, of New York City (Barry, Wainwright, Thacher & Symmers and John C. Crawley, all of New York City, on the brief), for appellant.

Charles W. Hagen, of New York City (Hagen & Eidenbach and John S. Bull, all of New York City, on the brief), for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

We accept the essential facts as found by the district court. The collision which gave

rise to these libels occurred in the Hudson River, between Hudson and Albany, shortly after dark on the evening of September 9, 1937. The Richard J. Barnes, a twin-screw Diesel vessel, was proceeding downstream at a speed of 7 knots over the bottom. Her course was down the middle of the channel, slightly favoring the westerly shore, which was to her starboard. The George A. Keating, a Diesel tug, with an oil barge in tow on her port side, was proceeding upstream at a speed of 1½ knots over the bottom. The Keating, bucking an ebb tide, was holding a course well to her port side of the river, no more than 100 feet from the westerly shore. The vessels first sighted each other's white lights when they were a mile and a half apart. Between them there was a bend in the river of a few degrees to the right, looking north. Neither vessel signalled to the other at this time, but the Barnes steered a few degrees to the starboard, showing the Keating her red light. When the boats had come to within less than 2,000 feet of each other, the Barnes blew a one-blast signal, signifying her intention to pass port to port. The Keating thereupon countered with two blasts, requesting a starboard-to-starboard passage, and the Barnes answered with a two-blast whistle. The Barnes immediately went astern on both her engines and turned her rudder sharply to port; the Keating, after an interval of about half a minute, stopped her engines. The forward starboard corner of the Keating's barge, which projected well ahead of the Keating's bow, struck the Barnes amidships on the latter's starboard side.

■ The district court found that the Barnes had accepted the Keating's proposal for a starboard-to-starboard passing at a time when such a passing was still practicable. The Barnes was held solely at fault for failure to navigate in accordance with her starboard-to-starboard agreement. We are not persuaded, however, that there was still opportunity for a safe starboard-to-starboard passage. The court made no finding as to the distance separating the vessels at the time the signals were exchanged. On the testimony of both captains, the vessels were then less than 1,600 feet apart, and approaching each other at a rate of roughly 1,000 feet per minute. They must have been approaching head and head, or nearly so, for the Barnes had already executed her maneuver to starboard and come to within 100 feet of shore. Im-

mediately after the signals were exchanged, the Barnes reversed and went hard aport; yet she was unable to avoid collision. It is barely possible that had she continued ahead and gone hard aport, she might have passed safely to starboard, but the possibility was not so great that we can conclude that a starboard-to-starboard passage was still practicable. The Barnes's action in reversing may conceivably have been an error of judgment, but not one so gross that we can condemn her for it in the emergency that confronted her.

■ Nevertheless the Barnes was at fault. She had the Keating in sight for a mile and a half. When the Barnes first saw the Keating, the Barnes was in the middle of the river, slightly favoring the westerly shore. The Keating was well over by the westerly bank, although the Barnes may not have realized that fact immediately because of the darkness and the slight bend in the river between them. As the vessels were proceeding, a starboard-to-starboard passage was quite feasible. If the Barnes knew the Keating's true position, the Barnes was at fault for shifting her helm to starboard before blowing any whistle. The vessels were or should have been navigating with respect to each other, and it was a fault for the Barnes to change her course without first securing the assent of the Keating by an exchange of one-blast whistles. Construction Aggregates Co. v. Long Island R. Co., 2 Cir., 105 F. 2d 1009, 1012. If the Barnes did not know the Keating's true position, but was in doubt as to the Keating's heading, then it was the duty of the Barnes to blow her "danger-signal." Rule III, Art. 18, Inland Rules, 33 U.S.C.A. § 203, rule 3; Construction Aggregates Co. v. Long Island R. Co., supra. And finally, if the Barnes continued to believe, down to the time of exchange of signals, that the Keating was on the latter's own starboard side of the river, when mere observation must have shown the contrary, then the fault of the Barnes in so believing is enough to condemn her. The master of the Barnes attempted to justify such a belief by saying that he saw the Keating's red light before the Barnes shifted her helm; but in view of the acknowledged positions of the vessels and the right-hand bend in the river between them, this tale must be considered apocryphal. Whichever hypothesis we accept as to the Barnes's knowledge of the Keating's heading, it was a fault for the Barnes to shift

her helm to starboard before exchanging any signals.

The Barnes was at fault in another respect. After the Keating had crossed the Barnes's one-blast with two whistles of her own, the Barnes replied with two blasts. If, as we indicated above, it was already too late for a successful starboard-to-starboard passing, the Barnes was negligent in blowing two whistles. Perhaps this signal need not be termed an acceptance of a starboard-to-starboard passage if the Barnes was in extremis, but in any event it was the misleading thing to do. The signal might well lead the Keating to believe there was such an acceptance, and thus encourage her not to reverse her engine immediately. Had the Barnes blown a danger signal instead of two whistles, and had the Keating consequently reversed at once, the accident might possibly have been avoided. The facts therefore do not justify excuse of the Barnes under the rule of The Cetus, 2 Cir., 202 F. 189, for action taken in an emergency.

■ The district court exonerated the Keating, but we believe she must be held also at fault. The Keating was admittedly on the wrong side of the river in violation of the Narrow Channel Rule, Art. 25, Inland Rules, 33 U.S.C.A. § 210. Her only excuse is that she was bucking an ebb tide with a tow, and that it was more convenient for her to bear to port, where the tide was not so strong. The "well-known river custom" which she claims to have been following is an extremely doubtful one under the evidence; in any event we have held that neither custom nor convenience will excuse a violation of the Narrow Channel Rule. Lehigh Coal & Nav. Co. v. Compagnie Générale Transatlantique, 2 Cir., 12 F.2d 337. The district judge ruled that this violation was a condition and not a cause of the accident, but we cannot agree. The Keating's error would be no more than a condition if the Barnes had been fully cognizant of the Keating's position, but it is quite evident that the Barnes was not aware of the Keating's bearing until too late. The Barnes was so far ignorant of the true situation that she shifted her helm to starboard and blew for a port-to-port passage. That the Barnes was negligent in so doing does not absolve the Keating of fault, nor does it militate against the conclusion that the Keating's violation of the Narrow Channel Rule was a proximate cause of the collision.

■ The Keating was also at fault for crossing signals. Even if the Barnes was wrong in blowing one blast, and even if the Keating had the right to insist on a starboard-to-starboard passage, the Keating did not have a right of way into collision. We have previously held vessels at fault for crossing signals, instead of blowing the danger signal and reversing, in "head-on situations," as here, The Quogue, 2 Cir., 47 F.2d 873; The Fulton, 2 Cir., 54 F.2d 467, and now the Supreme Court has held that "crossing situations," too, come under the same rule. Postal S. S. Corp. v. The El Isleo, 308 U.S. 378, 60 S. Ct. 332, 84 L.Ed. ——; Rule 2, Pilot Rules for Inland Waters. The Keating had no excuse for her failure to reverse and blow the danger signal. It is true that in Construction Aggregates Co. v. Long Island R. Co., supra, a majority of the court held that the Chicago was permitted to cross signals, but that case was complicated by the presence of a third vessel. Had the Chicago reversed, she would have run the danger of colliding with the third vessel coming up behind her. Peculiar considerations of safety were held to justify her in continuing ahead, and in crossing the signals of the Sandmaster. No such considerations existed here. There was nothing behind the Keating. Nor can the fault be excused on the theory that reversal of the Keating's engine would not have helped to avoid the accident. "What would have been the effect of this is of course uncertain, but it rests upon her to show beyond a doubt that it could not have avoided the collision." The Fulton, supra, 54 F.2d at page 469.

The two-blast response of the Barnes did not relieve the Keating of her fault in crossing signals. By that time it was too late to avoid the accident unless both vessels backed immediately, and perhaps even this maneuver would have been unavailing. As we have indicated, the feasibility of a starboard-to-starboard passage after all signals had been exchanged was not so clear as to excuse the Keating in demanding a passage to starboard by a cross-signal.

Decrees modified to provide for division of the damages between the two vessels.