### TIDE WATER ASSOCIATED OIL CO. v. THE SYOSSET et al.

### THE CARRYALL.

### TOWNSEND v. THE TYCOL et al.

### No. 10843.

United States Court of Appeals
Third Circuit.

Argued Dec. 18, 1952.

Decided March 16, 1953.

---

Vincent A. Catoggio, New York City (Ralph W. Chandless, Hackensack, N. J., Purdy, Lamb & Catoggio, New York City, on the brief), for appellant.

Warner Pyne, New York City (Pyne, Lynch & Smith, New York City, and Carpenter, Gilmour & Dwyer, Jersey City, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The barge Carryall, while in tow by the tug Syosset, collided with the tanker Tycol. The owner of the tanker, Tide Water Associated Oil Company, libeled the barge and tug and their owner, Woodford J. Townsend. The latter, in turn, libeled the tanker and its owner. The cases were consolidated for trial, following which the district court held both the tanker and the tug at fault and decreed an equal division of damages. Townsend has appealed, claiming that the tanker was solely at fault, and Tide Water has filed cross-assignments of error, claiming that the barge was also at fault, and, therefore, that the damages should be split three ways with Townsend, as owner of the tug and barge, bearing two-thirds of the total loss.

The district court, with abundant support in the record, found the facts substantially as narrated by Townsend, the master of the Syosset.[1] At about 3 a. m. on June 23, 1950, the barge Carryall was being towed stern first on the port side of the tug Syosset. The flotilla was making 4½ to 5 knots north up the easterly side of Newark Bay Channel. The Carryall displayed two white range lights and a red light on her port bow (as she was going). The Syosset was carrying red and green side lights, staff lights, and a white light forward. When the flotilla was about a nautical mile south of Flashing Green Buoy No. 1, which marked the entrance of Port Newark Channel into Newark Bay Channel, the lookout on the Carryall reported a vessel (which turned out to be the Tycol), rounding the buoy, showing her green light, and heading south in Newark Bay Channel. The Syosset then slowed and sounded a one-whistle signal. Hearing no reply from the Tycol and seeing her shut out her green light and show only her red, Captain Townsend assumed she had straightened out, and he went to full speed ahead. Soon the Tycol shut out her red light and showed only her green. The Syosset again slowed because, as Townsend said, the Tycol "made a zigzag on me." At this point he thought "Something was wrong aboard there [on the Tycol] * * *." Thereafter, the Tycol again showed her red light, and again the Syosset went to full ahead. Finally, the Tycol showed her green light a third time and sounded two blasts. This turn put her dead ahead of the Syosset, and, although the latter reversed, it was too late to avoid the collision. The Carryall's stern struck the starboard quarter of the Tycol. The collision occurred at the easterly edge of the channel just north of Nun Buoy No. 16. The night was clear, the tide flooding at about one-half knot, and there was a light breeze from the southwest. The channel at the point of collision is about four hundred feet wide.

We need not burden this opinion with a recital of the litany of the Tycol's many acts and omissions from which the district court concluded that she was to blame, for she concedes her fault.

The Syosset was held for failing to sound the danger signal and failing to stop

---

1. The opinion of the district court is reported in D.C.D.N.J.1952, 105 F.Supp. 281.

soon enough in the face of a risk of collision. She does not dispute the findings of fact but contends that those facts did not impose on her a duty to blow and stop.

Captain Townsend's own testimony, however, makes it clear that the Syosset treats her duty too lightly. He testified that after the Tycol rounded the buoy and entered the channel she began to zigzag; in fact, within about a half mile in this narrow channel, she showed her full green three times and her full red twice.[2] Furthermore, when the Tycol showed her green the second time, he thought something was wrong aboard her. Yet, in the face of this obvious danger, he proceeded full ahead. He argues here, however, that at all times he was hard by the nun buoys; that he signaled for a port-to-port passage when the Tycol was first sighted; that any rational navigator would have been justified in assuming that the final red light of the Tycol certainly indicated a safe, port-to-port passage; that in view of the wildly erratic navigation of the Tycol, he was put to a choice as to the best action to take, and, having exercised his experienced judgment, he should not now be condemned if that judgment, in retrospect, seems erroneous; and, finally, since it was merely an error in judgment in an emergency, considering the grievous faults of the Tycol, he should be absolved.

An uncritical examination of the record, however, discloses such plain fault on the part of the Syosset that we must hold her liable also, albeit reluctantly, because the Tycol was guilty of such gross faults. Rule III of Article 18 of the Inland Rules of Navigation[3] provides that "If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall *immediately* signify the same by giving several short and rapid blasts, not less than four, of the steam whistle." (Emphasis supplied.) The record makes it clear that in the circumstances that rule was applicable and was violated by the Syosset. Obviously, the zigzag course of the Tycol, after its failure to respond to the Syosset's signal, must have been incomprehensible to an approaching vessel. That it was so, was attested to by Captain Townsend. Yet, in spite of his uncertainty, he failed to follow the clear mandate of the rule and thus was guilty of a plain fault. In a situation such as existed here, the Syosset had no choice, for the duty imposed by the rule is mandatory. The law is well settled that when a vessel at the time of collision is violating a statutory rule intended to prevent collisions, the burden is hers to show that her fault could not have been a contributing cause.[4] This burden is on the Syosset even though the Tycol was grossly at fault.[5]

The facts here are strikingly similar to those in General Seafoods Corp. v. J. S. Packard Dredging Co., 1 Cir., 1941, 120 F.2d 117, at page 120, and if we substitute the Syosset for the Trim and the Tycol for the Exeter, what the court said there becomes dispositive of this phase of this case: "The Exeter bore the burden of showing not simply that there was 'reasonable doubt with regard to the propriety of the conduct' of the Trim but that there was a violation of a statutory rule intended to prevent collisions. The burden was then upon the Trim to show that this violation *could not* have contributed to the collision. This burden is on the Trim even though the Exeter was grossly at fault. Lie v. San Francisco & Portland S. S. Co., supra; The San Simeon, supra, 2 Cir., 63 F.2d at 801. The Trim has not borne the burden of proof required of her. It is impossible

---

2. The Tycol had discharged her cargo at Port Newark and was taking on ballast as she went. The district court found that at the time of the collision she was drawing three feet forward and ten feet six inches aft. Down at the stern, her pivoting point moved aft, thus shortening her turning arc and explaining her ability to veer quickly from side to side.

3. 30 Stat. 100 (1897), 33 U.S.C.A. § 203 (1928).

4. The Pennsylvania, 1873, 19 Wall. 125, 22 L.Ed. 148.

5. Lie v. San Francisco & Portland S. S. Co., 1917, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726.

to say that the collision would not have been averted even if the Trim had blown the danger signal as soon as the Exeter failed to answer the passing signal. When no answer was received, and the erratic course was continued, the uncertainty and danger were clearly increased. Perhaps the blowing of the danger signal would have roused some one on the Exeter to a realization of the danger. We cannot tell what she would have done or whether the fault of the Trim changed the result. However, the fault being a breach of a statutory rule, the Trim must satisfy any doubts as to whether its fault contributed to the collision, and the speculations as to what would have happened the law throws upon the vessel which fails in her duty. It has not been shown that the failure of the Trim seasonably to blow the danger signal could not have contributed to the collision; indeed, it would not be unreasonable to infer the contrary. Therefore, she must bear her share of the damage." (Emphasis in original.)

Of course, it is true that, up to a certain point, the Syosset was entitled to assume that the Tycol would be navigated according to the rules and would keep to her own side of the channel.[6] That assumption may not be indulged, however, in the face of facts showing that it is unwarranted.[7] Within about a half mile, the Tycol had changed course three times, thus making it evident that the probabilities were that she was not going to comply with the rules of navigation. The master of the Syosset admitted that he thought[8] something was wrong on the Tycol. The latter did not proceed straight down the channel and then, without warning, veer suddenly across the Syosset's course. That would be a perfect case in which to exon-

erate the Syosset on the basis of the assumption she seeks to invoke here. On the contrary, the Tycol's last "zig," which put her across the Syosset's course, was perfectly consistent with her prior conduct. If any assumption was justified on the part of the Syosset, it was that the Tycol would do exactly what she did.

Neither is the *in extremis* doctrine applicable here. It is properly applied only when an emergency arises suddenly.[9] Captain Townsend testified that between five and eight minutes elapsed between his first sighting the Tycol and the collision. All during that time the Tycol's erratic navigation indicated the risk of collision if she continued to so navigate. Here the situation which existed just after the Tycol's final "zig" had long been foreseeable as a probability. The only reason the Syosset was put to a sudden choice was that she failed to take more seasonable action. Had she sounded the danger signal when she should have, it is very likely that the necessity for a snap judgment would never have arisen. The Syosset may not atomize the conduct of the Tycol and say that the duty to blow arose only when the Tycol made her final turn across the Syosset's course. She must be judged in the light of the totality of events which confronted her from the time she first sighted the Tycol until the collision. So judged, her duty to blow was obvious, and it arose at a time when blowing would still do some good, that is, at the very latest, when the Tycol showed her green light the second time.

Nor is the major-minor fault rule[10] of any help to the Syosset. It is true that, were we free to apportion damages according to the degree of fault as is done by those countries which have adopted the Brussels

6. The Victory, (The Plymothian), 1897, 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519.

7. "Nor is such an assumption justified after the other vessel has indicated, by her signals or by her conduct, that she is not going to navigate as expected." Griffin, Collision § 20 (1949).

8. See Johnston-Warren Lines v. United States, 2 Cir., 1952, 196 F.2d 689, where

a vessel was held at fault in an ocean collision in a fog, for failing to stop when she "thought" she heard a fog signal forward of her beam.

9. National Bulk Carriers v. United States, 2 Cir., 183 F.2d 405, certiorari denied, 1950, 340 U.S. 865, 71 S.Ct. 89, 95 L.Ed. 631, and cases cited therein.

10. The City of New York, 1893, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84.

Collision Convention of 1910,[11] we would probably agree that a 50-50 division of damages here would be unjust. But even then we certainly could not say that the Tycol should bear 100% of the damages. The discussion above shows that the Syosset's failure to sound the danger signal *immediately*, when in doubt as to the Tycol's course or intention, had more than a minor part to play in causing the collision.[12] Therefore, under the rule administered in American admiralty, she must bear half the damages.

▮▮▮▮ Turning to the Tycol's arguments, we cannot subscribe to her contention that the Carryall should also be held at fault because she was appareled in range lights. The argument is that the Pilot Rule requires the tow, when it obscures the tug's side lights (as it did here), to carry the appropriately colored side lights [13] (here, a red light); Article I of the Inland Rules of Navigation then prohibits the tow from carrying any other lights which may be mistaken for the prescribed lights;[14] therefore, although the Carryall's red light was in compliance with the Pilot Rule, her white range lights violated the Inland Rule. We need not decide, however, whether the Carryall's range lights were proper, because, even assuming that they were not, we are convinced that such violation could not have contributed to the collision. The master of the Tycol testified that when he first sighted the flotilla he could see only the Carryall's white lights and that he was first led to believe that she was at anchor. We have an express finding, however, that the Carryall had a red light on her port bow (as she was going). The Tycol failed to see that light, probably because she had no lookout forward, relying entirely on those in her wheelhouse, one hundred eighty feet aft. In effect, the Tycol would have us hold that, even though she negligently failed to see the red light which was properly displayed, and saw only the white lights which may have been improperly displayed, the Carryall should be held at fault. But that argument proves too much, for had the Tycol not seen the white lights she would not have seen any lights and would then have been steaming blithely unaware of the approach of another vessel in a narrow channel. Consequently, the white lights were an aid in avoiding, rather than a factor in causing, the collision. Another reason for this result is that the master of the Tycol testified that he knew for a minute and a half before the collision that the white lights were on an approaching vessel. He had ample opportunity to correct his highly unusual navigation. The failure to carry proper lights will not render a vessel at fault when she was in fact seen by the other in time to have avoided the collision and the other thereafter fails to take proper avoiding action.[15]

The decree was correct and will be affirmed.

11. "Article 4. If two or more vessels are in fault, the liability of each vessel shall be in proportion to the degree of the faults respectively committed." Griffin, Collision 852 (1949).

12. See Boyer v. The Merry Queen, 3 Cir., 1953, 202 F.2d 575, where we refused to exonerate a vessel which had relied on the major-minor fault rule; see also note 11 in that case.

13. "Barges, canal boats or scows towing alongside a steam vessel shall, if the deck, deck houses, or cargo of the barge, canal boat or scow be so high above water as to obscure the side lights of the towing steamer when being towed on the starboard side of the steamer, carry a green light upon the starboard side; and when towed on the port side of the steamer, a red light on the port side of the barge, canal boat, or scow * * *." 33 Code Fed.Regs. § 80.16(e) (1949).

14. "Art. 1. The rules concerning lights shall be complied with in all weathers from sunset to sunrise, and during such time no other lights which may be mistaken for the prescribed lights shall be exhibited." 30 Stat. 96 (1897), 33 U.S. C.A. § 171 (1928).

15. Van Camp Sea Foods Co. v. DiLeva, 9 Cir., 1948, 171 F.2d 454; The West Point, 2 Cir., 1936, 85 F.2d 63; The Redwood, 9 Cir., 1936, 81 F.2d 680. See also the hypothetical situation supposed in Chamberlain v. Ward, 1858, 21 How. 548, 16 L.Ed. 211.