BABBIDGE & HOLT, Inc.

v.

THE HAWAIIAN PLANTER et al.

MATSON NAVIGATION CO.

v.

THE COLUMBIA QUEEN et al.

UNITED STATES

v.

THE HAWAIIAN PLANTER et al.

THE COLUMBIA QUEEN.

THE RACQUETTE.

Civ. A. Nos. 7235, 7238.

United States District Court
D. Oregon.

Aug. 6, 1954.

William F. White (White, Sutherland & Parks), Portland, Or., for Babbidge & Holt, Inc., and others.

Keith R. Ferguson, Sp. Asst. to the Atty. Gen., for the Government.

Gregory Harrison and Allan B. Aldwell (Brobeck, Phleger & Harrison), San Francisco, Cal., and Floyd A. Fredrickson (Gray & Lister), Portland, Or., for the Hawaiian Planter and another.

Kenneth E. Roberts (Mautz, Souther, Spaulding, Denecke & Kinsey), Portland, Or., for James Water Powell.

SOLOMON, Judge.

On September 24, 1953, the tug Columbia Queen, with barge Racquette, collided with The Hawaiian Planter in the Columbia River off Brookfield, Washington. These two libels, consolidated for trial, arose out of that collision.

Babbidge & Holt, Inc., and others representing the tug and barge interests libeled The Hawaiian Planter and her owner, The Matson Navigation Company, which cross-libeled to recover damages to The Hawaiian Planter.

The United States, as owner of the cargo of 700 tons of 8 inch artillery shells aboard The Racquette, some of which were lost or damaged when the barge sank, proceeded against all vessel interests as well as the pilot of The Hawaiian Planter to recover for the cargo damage.

At the time of the collision, the tug was taking the barge laden with ammunition from Bangor, Washington, to the Umatilla, Oregon, Ordnance Depot on the upper Columbia River.

The Columbia Queen is a tugboat with a wooden hull, 81.1 feet in length, 21.3 feet in beam, powered by a 600 horsepower Diesel engine.

The Racquette is an unmanned steel barge, without motive power converted to that use from an "LSM," 189.7 feet long with a beam of 34.0 feet.

A short time prior to this voyage, Captain Pearson was hired as master of the tug. Although he had considerable experience on the Columbia River, he had

not worked on the River for at least 4 years prior to this assignment and, during most of that time, he had worked on shore. His mate, Captain Cruse, had more than 35 years' experience on the River.

On September 20, 1953, while the Army was loading the barge at Bangor, Washington, Captain Rasmussen, the Operations Manager for Babbidge & Holt, Inc., drove Captain Pearson from Portland to Bangor where they boarded and looked over the tug and barge. Captain Rasmussen was well acquainted with them and their equipment. Captain Pearson had never seen them before.

The tug was equipped with an air whistle but it had no fog horn or auxiliary signaling equipment. The barge was equipped with an anchor but the anchor winch, which was powered by a gasoline engine, could not lift the anchor if it were dropped, because the fuel tank had been drained. Apparently this was done because the barge was loaded with ammunition. The small anchor on the tug was incapable of holding the tug and barge in a current of any strength.

The Columbia Queen left Bangor on September 21, and towing The Racquette astern, proceeded toward the Columbia River. The tug and barge passed the lightship in the mouth of the Columbia River at 11:30 p. m. on September 23.

Shortly after midnight, when the tug signaled in Young's Bay, on the south shore of the Columbia River between Astoria and Fort Stevens, her whistle stuck. After the engineer turned off the air supply, he discovered a burst diaphragm. There was no spare diaphragm on board and therefore the crew was unable to repair the whistle. Although repairs could have been made at Astoria on the following morning, Captain Pearson elected to proceed up the River with his load of ammunition without operating signaling or anchoring equipment, even though he knew that he would encounter fog. Captain Pearson did testify that he believed that, by turning on the air in the engine room, the whistle could be operated but no tests were made to confirm that belief.

The tug and barge reached Tongue Point at 12:30 a. m. on September 24. There The Racquette was drawn up and lashed to the starboard bow of The Columbia Queen. The line of her keel crossed the line of the tug's keel at a slight acute angle. The bow of The Racquette extended approximately 150 feet forward of the tug's bow, while the tug's stern extended 40 feet aft of the barge's stern. The over-all length of tug and tow is stipulated as 230 feet, and over-all width as 56 feet. Until the barge broke free and drifted away to sink after the collision, this arrangement was unchanged.

At 2:30 a. m., after tying the barge along side, the tug proceeded up river despite the presence of fog. Captain Pearson was on the bridge until 4 a. m., when Captain Cruse took over.

Captain Cruse brought the tug and barge up the Columbia River approximately 15 miles from Astoria to a point near Brookfield, Washington, which is on the north bank of the River.

There a small bay is formed by Three Tree Point on the east and Jim Crow Point on the west. The distance between the two Points is approximately 3750 yards. Pillar Rock Upper Range marks the 500 foot dredged channel off Brookfield. The town of Brookfield is near the base of Jim Crow Point. A vessel coming around Three Tree Point to get on the range would proceed in a southwesterly direction for about 2300 yards from Three Tree Point, and at Flashing Green Buoy 21, which marks the northeastern point of the range, would turn to her starboard to get on the range. Flashing Red Buoy 18, approximately 400 yards south of Jim Crow Point, marks the southerly edge of Pillar Rock Upper Range.

The Columbia River is a narrow channel between Jim Crow Point and Three Tree Point even though vessels moving up and down the River are not confined

to the 500 foot dredged channel marked by Pillar Rock Upper Range.

Outside this channel and on the south side of the River, there was sufficient space in which the tug and barge could have maneuvered safely.

Shortly before 5:45 a. m., because of fog and the lack of proper anchoring and signaling equipment, Captain Cruse decided that it was unsafe to proceed up the River any further. He therefore decided that, until the fog lifted, he would remain in the bay close to Brookfield which is well north of the channel.

At that time, he could see Red 18 and Three Tree Point, but Green 21 and the Pillar Rock Upper Range markers, which are east of Three Tree Point, were obscured by fog.

At approximately 5:45 a. m., he awakened Captain Pearson and discussed the situation with him. Captain Pearson immediately took over the command from Captain Cruse. He then took the barge out several hundred yards from the position maintained by Captain Cruse, and testified that he attempted to maintain a position in line with the tips of Three Tree and Jim Crow Points, which line is about 200 yards from the north edge of the dredged channel.

The Hawaiian Planter is a C–3 type vessel. She measures 492 feet in length, 69 feet 10 inches in beam, and is powered by an 8500 horsepower steam turbine. At the time of the collision, she was drawing 25 feet 10 inches forward and 28 feet 4 inches aft.

The vessel was on a voyage from Portland, Oregon, to Honolulu, T. H. She was piloted down the Willamette and Columbia Rivers by Captain Powell, who had 6½ years' service as a Columbia River pilot and 23½ years' service on the Columbia River as a tugboat captain and crew member.

The Hawaiian Planter entered the Columbia River in the early morning of September 24. She passed St. Helens, Oregon, at 2:13; Longview Bridge, at 3:26, and reached Skamokawa, Washington, at 5:56. Because of fog, Captain Powell, on several occasions, attempted to anchor but each time the proposed anchorage was occupied.

When The Hawaiian Planter reached Skamokawa, the fog cleared. Thereafter, when the terrain permitted, both vessels were in view of each other and all navigational aids were visible. At all material times, Captain Pollard, the master of The Hawaiian Planter, was on the bridge with Captain Powell. The second officer, on watch, and a helmsman were also on the bridge. A carpenter was stationed at the anchors and an able-bodied seaman acted as lookout in the bow.

At 5:59½, shortly after The Hawaiian Planter passed Skamokawa, her engine speed was increased from "slow ahead" to "half ahead." Both Captains Pollard and Powell testified that they saw the tug and barge below Jim Crow Point and west of Red 18 on the south side of the range and that they saw open water between the tug and Jim Crow Point. From that time until the time of the collision, they had the tug and barge under observation.

Just prior to passing Three Tree Point, The Hawaiian Planter sounded a whistle. At approximately 6:10½, when the vessel was about one to two ship lengths above Green 21, Captain Powell signaled for a port-to-port passing. At the same time, her speed, then 12 to 13 knots over the water, was ordered reduced by a "slow ahead" signal to the engine room.

The port-to-port passing signal was not answered. Captain Powell was not disturbed by this failure to respond because he was well aware of the fact that many tugs on the Columbia River do not respond to such signals. Although he was unaware of the fact that the tug was unable to respond, he kept the tug under constant observation.

From Three Tree Point to Green 21, The Hawaiian Planter was on a course of 252 to 253. She turned on the range approximately 140 feet south of Green 21. The helm was ordered "right easy" and for a brief instant "easy" placing the rudder amidships and steadying The Hawaiian Planter on her right side of the

channel. At this point, both Captains Pollard and Powell were watching the movements of the tug and barge with glasses. When they saw the tug begin to turn to her port, that is, to the north side of the channel and across the course of The Hawaiian Planter, Captain Powell ordered the 4-blast emergency signal, another 1-blast port passing signal, hard right rudder, emergency full astern, and the starboard anchor dropped. All of these orders were given almost simultaneously between 6:12 and 6:12½.

The Columbia Queen continued upstream and toward the Washington shore cutting across The Hawaiian Planter's bow. At 6:14½, the starboard side of The Racquette struck the bow of The Hawaiian Planter which was then dead in the water and had practically no forward motion. The place of the collision was approximately one ship length, or 500 feet, north of the channel, generally off Brookfield dock.

After The Racquette struck The Hawaiian Planter, the lashing, tying the barge to The Columbia Queen, broke. Captain Pearson exchanged a few words with The Hawaiian Planter and then attempted to push the barge on the beach near Jim Crow Point. He was unsuccessful and the barge turned over and sank.

It is difficult to reconcile the two versions of the collision. Captain Pearson testified that, from the time he first sighted The Hawaiian Planter, he kept the tug at least 200 yards north of the dredged channel and that he headed toward the Washington bank only to beach the barge and avoid being struck by The Hawaiian Planter. The tug's crew testified that the Hawaiian Planter passed inside Green 21 and headed either for Jim Crow Point or the bank north of Jim Crow Point.

On the other hand, the pilot, master, and mate of The Hawaiian Planter all testified that the tug and barge were in the channel when they rounded Three Tree Point.

Both Captain Powell and Captain Pollard impressed me as exceptionally intel-ligent and competent persons and truthful witnesses. Their testimony is credible and much more probable than the testimony of the witnesses who testified on behalf of the tug.

I am of the opinion that The Hawaiian Planter followed a course of action which was properly designed to halt the vessel in the shortest possible time and that such action also offered The Columbia Queen the greatest possible chance of avoiding a collision. The course adopted by The Columbia Queen and her failure to stop her engines or to reverse them is understandable only as an act of panic.

It is true that the master and pilot of The Hawaiian Planter, by adopting different maneuvers, could have avoided the collision, but it must be remembered that, practically up until the time that the emergency signal was sounded and the other steps were taken by The Hawaiian Planter at 6:12, they properly regarded themselves as facing a routine passing situation. They had no knowledge of Captain Pearson's intention or of the fact that The Columbia Queen lacked signaling equipment to convey such intention. Even if other pilots faced with the same emergency might have issued other orders which would have, as the facts developed, avoided the collision, I do not believe that the orders given and executed were improper.

■ I find the Columbia Queen to have been negligent in the following respects, all of which contributed to the collision:

1. In proceeding up the Columbia River from Astoria without any operating signaling equipment.

2. In navigating on the wrong side of the channel.

3. In proceeding upstream and to its port after receiving the proper port to port passing signal of The Hawaiian Planter.

4. In failing to take any action to avoid collision. The tug followed the one course which insured collision. Had The Columbia Queen cut her engines and backed with the tide, or, more properly, put her engines astern, the collision would not have occurred.

As I announced at the conclusion of the trial, the fault of The Columbia Queen is clear. Her voyage viewed as a whole was characterized by a reckless indifference to safety. I find that The Columbia Queen was guilty of gross negligence.

The remaining question is whether The Hawaiian Planter was also at fault. Proctors for The Columbia Queen and for the Government contend that The Hawaiian Planter was guilty of numerous faults. In each of the claimed statutory faults, proctors invoke the rule of The Pennsylvania, 1873, 19 Wall. 125, 22 L. Ed. 148.

I shall consider each contention made by The Columbia Queen and the Government, or either of them, in their memoranda.

■■ 1. The Hawaiian Planter committed a statutory fault in turning to her starboard before receiving an answer to her port-to-port passing signal.

This contention ignores the fact that The Hawaiian Planter was proceeding around a bend in a narrow channel and was under an obligation to keep her relative position in relationship to the north edge of the channel. A straight course around a bend in a channel is in relation to the channel shape and is not a geometric line. City of New York v. American Export Lines, 2 Cir., 1942, 131 F.2d 902, 1943 A.M.C. 34. A vessel so proceeding, until the other vessel does some act to indicate non compliance with the rules may assume that the approaching vessel will stay on her own side of the channel. The Victory & The Plymothian, 1897, 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519.

The Government relies largely on language in City of New York v. American Export Lines, supra, 131 F.2d at page 905, to support its position and analogizes The Hawaiian Planter to the Exporter. That case did not involve a narrow channel. It is significant that, in spite of the favorable language which Government proctors have extracted from the opinion, the court dismissed the claim of fault based upon the Exporter's an-

ticipatory turn and held that the Coney Island was solely at fault.

On this point, The Columbia Queen relies upon The Richard J. Barnes, 2 Cir., 1940, 111 F.2d 294, 1940 A.M.C. 627, citing language at 111 F.2d 295. In that case, the tug was proceeding up the Hudson River and The Richard J. Barnes was proceeding in the opposite direction. The tug was on her wrong side of the River and The Richard J. Barnes was slightly to the right of her middle of the channel. In spite of the fact that the tug was on the wrong side of the channel, The Richard J. Barnes signaled for a port-to-port passing. Immediately upon receiving such signal, the tug signaled for a starboard passing and The Richard J. Barnes, which had already turned, assented to the tug's proposed passing when such passing was not feasible. In that case, the court held that both the tug and Richard J. Barnes were at fault.

In this case, I find that The Hawaiian Planter did not materially alter her course after signaling for a port-to-port passing before receiving an answer thereto but was merely maintaining her relative position in the narrow channel.

■ 2. The Hawaiian Planter committed a statutory fault by failing to blow alarms immediately when she received no reply from the tug.

At the time The Hawaiian Planter signaled for a port-to-port passing, she was traveling at slow speed on her own side of the channel. The men on the bridge were keeping the tug under constant observation with their glasses. In spite of the fact that the tug failed to respond to her signal immediately, everything pointed to a normal narrow channel passing. This situation prevailed from the time the signal was given until the tug crossed the intended path of The Hawaiian Planter, at which time, The Hawaiian Planter sounded her emergency alarms, backed, and anchored.

An analysis of the authorities cited by The Columbia Queen and the Government shows that The Hawaiian Planter was not entitled to rely or follow to the bitter

end her own proper but unanswered signal, but that it was her duty to diligently observe the course of the tug and act promptly upon discovering that the tug would neither signal nor act in accordance with the signal. This The Hawaiian Planter did. It is that fact which distinguishes this case from Tide Water Associated Oil Co. v. The Syosset, 3 Cir., 1953, 203 F.2d 264, 1953 A.M.C. 730, and The Albert Dumois, 1900, 177 U.S. 240, 252, 20 S.Ct. 595, 44 L.Ed. 751.

 3. The Hawaiian Planter committed a statutory fault by not sounding the backing signal.

The master of The Columbia Queen admitted that he had The Hawaiian Planter under constant observation and that he heard her danger signal and her anchor drop, which acts accompanied the emergency full astern movement. In these circumstances, three more blasts would have been superfluous and their absence is not a fault. The Columbia Queen was heading toward The Hawaiian Planter, an act even more inexplicable if she believed the ship to be going forward.

I find that The Columbia Queen would have followed her actual course no matter what signals The Hawaiian Planter gave, and that the absence of such signals could not have caused the collision.

 4. The Hawaiian Planter was in fault for leaving the dredged channel.

The credible testimony and the location of the collision make it abundantly clear that The Hawaiian Planter followed her right side of the channel until the tug changed course, at which time her pilot decided to execute maneuvers which would, and did, halt his vessel's movement by bringing the vessel toward the Washington shore. The location of impact, one ship's length north of the channel, shows that his decision was effective. Considering the cumulative effect of the rudder, anchor, and screw, it is clear that The Hawaiian Planter did not chase the tug into the bay.

 5. The Hawaiian Planter did not navigate properly in fog.

Although several shore witnesses testified that their view of the River was obstructed by fog off the mouth of Jim Crow Creek, all of the witnesses on both vessels testified that they could see each other at all times the terrain permitted. The navigational aids were also visible. In these circumstances, there was no reason for The Hawaiian Planter to plot the position of the tug by radar. Nor is there any reason to invoke the rules governing speed in fog since, as far as the two vessels were concerned, there was no fog obstructing or impeding navigation.

 Considering the evidence as a whole, I find that the Columbia Queen was guilty of gross negligence, and I further find that the faults of The Hawaiian Planter, if any, were trivial and did not and could not have caused the collision. I therefore find The Columbia Queen to be solely at fault.

Proctors for Hawaiian Planter to prepare findings and an interlocutory decree in each cause.