NATIONAL IRANIAN TANKER COM-
PANY (NEDERLAND), N. V., owner of
the TANK VESSEL REZA SHAH THE
GREAT, Plaintiff,

v.

The TUG DALZELL 2 and Richard Joyce
Smith, William J. Kirk and Harry W.
Dorigan, as Trustees of the property of
the New York, New Haven & Hartford
Railroad Company, Defendants.

No. 64 Ad. 1263.

United States District Court
S. D. New York.

May 8, 1968.

Burlingham, Underwood, Wright, White & Lord, New York City, for plaintiff, Stanley R. Wright, Robert B. Pohl, New York City, of counsel.

William A. Wilson, New York City, for defendants, John J. Nolan, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiff, National Iranian Tanker Company (Nederland), N.V., instituted this admiralty action seeking to recover for damages to the tank vessel 'REZA SHAH THE GREAT (the tanker) allegedly sustained by reason of a collision at Hell Gate in the East River, New York, between the tanker and the carfloat NEW HAVEN 65 (the NH 65), which carfloat, with carfloat NEW HAVEN 68 (the NH 68), was in tow of the tug DALZELL 2 (the tug). The tug and tow, the NH 65 on the tug's port side and the NH 68 on her starboard side, are hereinafter referred to as the flotilla. This opinion is written following a four-day trial and constitutes the Court's findings of fact and conclusions of law (Rule 52(a), Federal Rules of Civil Procedure).

The collision occurred at approximately 3:35 p. m. on October 27, 1964 when the stern port corner of the NH 65 came into contact with the port side of the tanker approximately 80 feet from the tanker's bow. At the time of the collision, the tanker's bridge (approximately 220 feet from her bow) was passing under the Triborough Bridge. The weather was clear; there was little or no wind; and the tide was first of the ebb, running from east to west at less than one knot. Following the collision, the tanker went aground at Steep Rock, on the Astoria shore, approximately halfway between the Triborough Bridge and the Hell Gate Bridge.

Plaintiff contends that the collision and the grounding of the tanker were caused solely by the fault of the tug in failing to keep the flotilla under control and on its own side of the channel in accordance with the Narrow Channel Rule (33 U.S.C. § 210) and in failing to give the required whistle signals. On the other hand, the defendants contend that the collision was caused solely by the fault of the tanker in navigating on the flotilla's side of the channel in violation of the Narrow Channel Rule. Therefore, the principal issues are: where the collision occurred, whether on the tanker's or the flotilla's side of the channel; and whether prior to the collision the tanker and the flotilla were navigating on their respective sides of the channel. The Court finds that the collision occurred on the tanker's side of the channel and that the collision and grounding of the tanker were caused solely by the fault of the tug.

### The Tanker

The tanker, owned by plaintiff, a Netherlands corporation, and approxi-

mately 665 feet long, with a beam of approximately 83 feet and drawing 34 feet 6 inches fore and aft, was proceeding from Stapleton, Staten Island to 138th Street, Bronx. She was under the command of Captain Veldhuizen, who was on the bridge with the Pilot, Captain Mason; Third Officer Janssens; the quartermaster at the wheel; and a lookout who was on the starboard wing of the bridge. The Chief Officer, Van Holten, who was off duty, was on the port wing of the bridge, and a crewman was stationed approximately 40 feet from the tanker's bow as a lookout and was in charge of the anchors.

The tanker proceeded up the East River, navigating along the west side of Welfare (Blackwells) Island. She approached Hell Gate at half speed[1] and blew a bend signal (33 U.S.C. § 203, Rule V) when she was off Horns Hook north of Welfare Island. As she approached Hallets Point, right rudder was ordered, her engines were ordered to full speed, and the tanker turned to starboard around Hallets Point, navigating to her starboard of the middle of the channel.[2] When she came abeam of Hallets Point Light (at 1530 according to her deck bellbook and engine bellbook), left rudder and half speed were ordered. Just after these orders were given and when the tanker had just rounded Hallets Point, the Captain, the Pilot and others on her bridge observed the flotilla for the first time at a point just below Hell Gate Bridge between that Bridge and the Triborough Bridge. They did not hear a bend signal or any other whistle signal from the flotilla, and the testimony of disinterested witnesses establishes that no whistle signals were blown by the flotilla.

When the flotilla was first observed by the tanker, the tanker was in the middle or slightly to her starboard of the middle of the channel[3] and the flotilla was navigating on its starboard side of the channel at least 2500 feet from the tanker. The tanker blew a port-to-port passing signal (33 U.S.C § 203, Rule I), which was not answered by the flotilla, right rudder was ordered, and she proceeded on a course which would bring her towards the middle of the channel under the Triborough Bridge. The tanker continued at half speed ahead and was moving through the water at approximately 4 to 5 knots per hour. As the tanker was so proceeding, those on her bridge observed the flotilla begin to turn on its own axis in crab fashion with the port stern of the NH 65 swinging to her port out into the channel and the starboard bow of the NH 68 swinging to her starboard. To those on the tanker's bridge, the flotilla appeared to be moving into the middle of the channel as it drifted down with the tide. As the flotilla approached the Triborough Bridge, the movement towards mid-channel continued and became more rapid and, for the first time, it appeared to the Captain and the Pilot

---

1. Through still water on a straight course the tanker's speed for harbor maneuvering was 9 knots per hour at full ahead and 6 knots per hour at half ahead.

2. The evidence that the tanker was navigating to her starboard of the middle of the channel as she approached and came around Hallets Point includes the testimony of Captain Veldhuizen at his deposition on November 4, 1964 and at the trial; the testimony of Captain Mason at the trial; and the sketches drawn by Captain Mason on October 27, 1964, shortly after the collision, and on September 2, 1965, when his deposition was taken.

3. The evidence that the tanker was navigating in the middle or slightly to her starboard of the middle of the channel when she first observed the flotilla includes the testimony of Captain Veldhuizen at his deposition on November 4, 1964 and at the trial; the sketch drawn by Captain Veldhuizen at the Coast Guard hearing shortly after the collision; the testimony of Captain Mason at the trial and the sketches drawn by him on October 27, 1964, on October 28, 1964 at a Coast Guard hearing, and on September 2, 1965; the testimony of Third Officer Janssens and of Chief Officer Van Holten at their depositions on November 19, 1964; and the testimony at trial and the sketches of DeBold, a disinterested witness who observed the collision.

that there was a danger of collision. The tanker thereupon blew a danger signal of between 5 and 7 short, rapid whistle blasts (33 U.S.C. § 203, Rule III) and at the same time (1533 according to the tanker's deck bellbook and engine bellbook) right rudder and full speed ahead were ordered. At this time, the tanker and the flotilla were less than 1500 feet apart. According to the testimony of the Captain, the collision would not have been avoided if the tanker's engines had been ordered full speed astern since she would have proceeded 3,000 to 4,000 feet before coming to a stop.

The effect of the orders for right rudder and full speed ahead was to swing the tanker's bow to starboard and her stern to port, putting her on a course headed for Steep Rock on the Astoria shore. When the Pilot observed that the stem of the tanker would clear the flotilla, he ordered hard left rudder. This stopped her swing to starboard and she began to steady up when the collision occurred, at which time the bow of the tanker was on her starboard side of the channel, her bridge was slightly to the starboard of mid-channel, and her stern was mid-channel or slightly to the port of mid-channel.[4]

As a result of the collision, the weight of the flotilla was against the port side of the tanker, so that the tanker did not swing to port in response to the hard left rudder order and she continued towards Steep Rock.

At 1536 or 1537, according to the tanker's deck bellbook, the tanker's engines were ordered full speed astern,[5] followed by double full speed astern, and the tanker's port anchor was dropped, two shackles, followed by her starboard anchor, one shackle. The tanker went aground at Steep Rock, and a couple of minutes later she backed off. The tug PATRICIA MORAN, navigating without a tow down the East River some 700 feet behind the flotilla, came to the tanker's assistance, tying up to the tanker's starboard side.

■ Following the grounding, the tanker proceeded to 138th Street, Bronx, where Lt. Russell A. Cahill of the Coast Guard, who was assigned to investigate the cause of the collision, came aboard the tanker. Lt. Cahill testified that he interviewed Captain Veldhuizen, the Pilot, Captain Mason, and Chief Officer Van Holten, and that, based on the information given to him, he filled out a report on Coast Guard Form 2692 which, upon completion, was signed by Captain Veldhuizen, who testified that he did not read the report before signing it. Item 18 of the report gives the location of the collision as 250 feet off Negro Point Light, which, according to the charts in evidence, would place the tanker on her port side of the channel and the flotilla on its starboard side of the channel. Both Captain Veldhuizen and Captain Mason denied giving this information to Lt. Cahill. Captain Veldhuizen testified that the tanker carried the British Admiralty chart and that, at the time, he did

4. The evidence that the tanker was on her starboard side of the channel when the collision occurred includes the evidence referred to in note 3, supra, including the testimony of Captain Mason that at the time of the collision he saw to the left of the port wing of the tanker's bridge, the two green lights on the Triborough Bridge which mark the center of the channel under the Bridge, and the testimony and sketch of Captain Ericksen, the Captain of the tug PATRICIA MORAN, who testified before the Coast Guard on October 29, 1964 with respect to the collision. Captain Ericksen's tes-

timony and the sketch he drew when he testified were received in evidence at the trial.

5. The entry in the tanker's deck bellbook giving the time the tanker's engines were ordered full speed astern after the collision, was changed to 1537 from either 1538 or 1536. Captain Veldhuizen and Chief Officer Van Holten testified that the entry was changed from 1538 but an examination of the entry indicates that it may have been changed from 1536. The other evidence adduced at trial indicates that the order could have been given at either 1536 or 1537.

not know where Negro Point was. Captain Mason drew a sketch at the time of the interview with Lt. Cahill to show the positions of the tanker and the flotilla prior to and at the time of the collision, indicating that the collision occurred on the tanker's side of the channel. The only other person present at the interview when the report was prepared was the Chief Officer, Van Holten, whose deposition was read at the trial but who did not testify. There is no evidence to indicate that he had greater knowledge concerning Negro Point than Captain Veldhuizen and, for the reason stated by Captain Veldhuizen, it is unlikely that Van Holten knew where Negro Point was. The testimony of both Captain Ericksen of the tug PATRICIA MORAN, and De-Bold, a sailing enthusiast who observed the collision from the Astoria shore approximately 750 feet above the Hell Gate Bridge, corroborates the evidence that the collision took place on the tanker's side of the channel and negates the statement in the Coast Guard report that it occurred 250 feet off Negro Point. Accordingly, on all of the evidence, the Court concludes that the collision occurred on the tanker's side of the channel.

*The Flotilla*

The tug, 102 feet long with a beam of 26 feet, was operated and controlled by the defendants as trustees of the New York, New Haven & Hartford Railroad Company. The flotilla consisted of the tug and carfloats NH 65 and NH 68, each 360 feet long with a beam of 40 feet, made up together in the shape of a V. The NH 65 was light, carrying no railroad cars, and the NH 68 was partially loaded, carrying 10 to 15 railroad cars. The tug was between the carfloats with the NH 65 on the tug's port side and the NH 68 on her starboard side. The bow of the tug was approximately 240 feet astern of the bows of the carfloats and the sterns of the carfloats extended a few feet beyond the stern of the tug. Each carfloat was secured to the tug by two lines, one from the bow of the tug and the other from the stern of the tug, and the bows of the carfloats were secured together by cross lines. The flotilla was 360 feet long, approximately 80 feet wide at the bows of the carfloats and 120 to 130 feet wide at their sterns. The flotilla was proceeding from Oak Point, Bronx, to Jersey City, New Jersey, navigating down the East River through Hell Gate, with the tug under the command of Captain Marien.

Captain Marien testified that the tug blew a bend signal before the flotilla reached the Hell Gate Bridge [6] and then proceeded under the bridge, navigating near the Wards Island shore on the flotilla's starboard side of the channel, at a speed of approximately 4 knots an hour taking into account the one-knot tide running with the flotilla. He testified that he first observed the tanker just after the flotilla passed under the Hell Gate Bridge, that the tanker was too close to the Wards Island shore for his "comfort," and that he did not hear any whistle signals from the tanker. Upon observing the tanker, Captain Marien put the tug's engines at stop and after a brief interval, put the tug's wheel to starboard and her engines ahead, causing the bow of the flotilla to swing to starboard and its stern to swing to port. As a result, the flotilla swung away from Wards Island towards the middle of the channel. Captain Marien testified that he heard the tanker's danger signal, which he thought was a backing signal, and that, upon hearing it, he put the tug's wheel to port and her engines full speed ahead in an effort to avoid collision. Nevertheless, the stern port corner of the NH 65 came into contact with the port side of the tanker. Captain Ericksen of the PATRICIA

---

6. Captain Marien testified that the bend signal was the only signal blown by the tug although three of her crewmen testified that the tug blew both a bend signal and a port-to-port passing signal. Those on the tanker and the other witnesses who testified said they heard no whistle signals from the tug. The Court finds on the evidence that the tug did not blow a passing signal or a danger signal, and that whether or not she blew a bend signal is immaterial.

MORAN testified before the Coast Guard that had the tug's wheel been put to port sooner, the collision would have been avoided.

Captain Marien testified that the collision occurred on the flotilla's side of the channel but on all the evidence, the Court finds that the collision occurred on the tanker's side of the channel and a study of the charts in evidence indicates that the flotilla had at least half of the channel (between 400 and 450 feet) to pass between the tanker and the Wards Island shore. There was no evidence that any other vessels, except the PATRICIA MORAN, were navigating in the vicinity at the time.

The sole cause of the collision was the negligence of the tug in failing to keep the flotilla on its starboard side of the channel and in failing to blow a danger signal.

■ The Narrow Channel Rule applied to the navigation of the tanker and the flotilla through Hell Gate. See The Michael Tracy, 43 F.2d 965 (2d Cir. 1930), cert. denied, 282 U.S. 895, 51 S. Ct. 180, 75 L.Ed. 789 (1931); see also Martin Marine Transp. Co. v. Jakobson & Peterson, Inc., 135 F.2d 325 (2d Cir. 1943); The Nassau, 35 F.2d 709 (2d Cir. 1929). The Narrow Channel Rule (33 U.S.C. § 210) provides in relevant part as follows:

> "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel. * * *."

■ When Captain Marien first sighted the tanker, the flotilla was on its starboard side of the channel. If the flotilla had maintained its course in relation to the Wards Island shore, the collision would not have occurred. Captain Marien, however, put the tug's engines at stop and put her wheel to starboard, causing the flotilla to swing towards mid-channel and to cross into the tanker's side of the channel. The tug was negligent in failing to keep the flotilla under control and on its own side of the channel (see

New York Central Railroad Co. v. Texaco Inc., 226 F.Supp. 140, 149–150 (S.D.N.Y. 1964)), and her negligence was the cause of the collision. When the collision occurred, part of the flotilla had entered the waters on its port side of the channel in violation of the Narrow Channel Rule, which constituted a statutory fault. See, e. g., Matton Oil Transfer Corp. v. The Greene, 129 F.2d 618 (2d Cir. 1942); Moore-McCormack Lines, Inc. v. S.S. Portmar, 249 F.Supp. 464, 468 n. 12 (S.D.N.Y.1966).

■ If the tug was in doubt concerning the tanker's course or believed there was danger because the tanker appeared to be too close to the Wards Island shore, the tug should have blown a danger signal. See, e. g., Esso Standard Oil Co. v. Oil Screw Tug Maluco I, 332 F.2d 211 (4th Cir. 1964); Esso Standard Oil Co. v. The President Garfield, 279 F.2d 540 (2d Cir. 1960). The tug's failure to blow a danger signal was also a statutory fault and the evidence does not establish that this fault could not have contributed in causing the collision. The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). If the tug had blown a danger signal when Captain Marien first sighted the tanker and when the vessels were at least 2500 feet apart, it would have alerted the tanker to try to give the flotilla more room to pass.

The negligence of the tug was the sole cause of the collision and was clear and inexcusable. The tug sighted the tanker just after the flotilla had passed under the Hell Gate Bridge (which is approximately 1600 feet above the Triborough Bridge) and just after the tanker had rounded Hallets Point when there was at least 2500 feet between the vessels. Captain Marien could have navigated towards the flotilla's starboard side of the channel had he put the tug's wheel to port sooner than he did.

■ There was evidence that prior to the collision the tanker may have navigated at mid-channel or partially on her port side of the channel when she rounded Hallets Point and as she made her ap-

proach to the Triborough Bridge.[7] However, the defendants have not established by "clear and convincing" evidence that the tanker navigated on her port side of the channel in violation of the Narrow Channel Rule. The Victory & The Plymothian, 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519 (1897); The Oregon, 158 U.S. 186, 15 S.Ct. 804, 89 L.Ed. 943 (1895); The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893). Even if the tanker was found to have violated the Narrow Channel Rule, the violation would have been minor and her fault would not have warranted a division of damages. The Great Republic, 90 U.S. (23 Wall.) 20, 35, 23 L.Ed. 55 (1874); Compania De Maderas v. The Queenston Heights, 220 F.2d 120 (5th Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955); Griffin, The American Law of Collision § 224 (1949); see City of New York v. American Export Lines, Inc., 131 F.2d 902 (2d Cir. 1942); Villain & Fassio E Compagnia v. Tank Steamer E. W. Sinclair, 207 F. Supp. 700, 712 (S.D.N.Y.1962), aff'd per curiam, 313 F.2d 722 (2d Cir.), cert. denied, 373 U.S. 948, 83 S.Ct. 1678, 10 L. Ed.2d 704 (1963).

Moreover, if the tanker had been found to have violated the Narrow Channel Rule, her fault would have been a "condition" and not a "cause" of the collision. See The Sanday, 122 F.2d 325 (2d Cir. 1941); The Cornelius Vanderbilt, 120 F.2d 766 (2d Cir. 1941); The Syosset, 71 F.2d 666 (2d Cir. 1934); The Perseverance, 63 F.2d 788 (2d Cir.), cert. denied,

289 U.S. 744, 53 S.Ct. 692, 77 L.Ed. 1490 (1933); Long Island R. Co. v. Killien, 67 F. 365 (2d Cir. 1895); Arundel Corp. v. The City of Calcutta, 172 F.Supp. 593, 596 (E.D.N.Y.1958); see also The Richard J. Barnes, 111 F.2d 294 (2d Cir. 1940); Construction Aggregates Co. v. Long Island R. Co., 105 F.2d 1009 (2d Cir. 1939); The Michael Tracy, supra; compare Matton Oil Transfer Corp. v. The Greene, supra; see generally Petition of Kinsman Transit Company, 338 F.2d 708, 719–721 (2d Cir. 1964), cert. denied, 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); Williamson v. The Tug Carolina, 158 F.Supp. 417, 423 (E.D. N.C.1958). As soon as it appeared that there was danger of collision, the tanker did everything that was reasonably possible to avoid the collision but was unable to avoid it. On the other hand, the tug observed the tanker and had ample opportunity and the "last clear chance" to avoid the collision. Nevertheless, the tug did not take action until it was too late. As the Court stated in Long Island R. Co. v. Killien, supra, 67 F. at 367–368,

> "the [tanker] * * * should not [be condemned] * * * for the consequences of a collision, which * * * would not have occurred if the other vessel had exercised ordinary care to avoid it. * * * [The judgment of the tanker's pilot in navigating the tanker] was not a rash one, or one which should be pronounced erroneous merely because subsequent events have shown that there would not have been

---

7. In order to navigate through Hell Gate, the tanker had to swing to starboard around Hallets Point and then swing to port to pass Negro Point and avoid the Astoria shore. The further she swung towards her starboard side of the channel before reaching Negro Point, the more difficult it would become for her to avoid the Astoria shore. Until it appeared that the flotilla would not pass the tanker port to port and that there was a danger of collision, the tanker was entitled to presume that the flotilla would keep to its starboard side of the channel. The Victory & The Plymothian, 168 U.S. 410, 426, 18 S.Ct. 149, 42 L.Ed. 519 (1897).

Prior to the time the tanker blew a danger signal, there was no indication that the flotilla would not pass the tanker port to port without danger of collision. Accordingly, the tanker was not required to alter her course to starboard or to blow a danger signal earlier than she did or to stop and back, even though her port-to-port passing signal was not answered by the flotilla. Babbidge & Holt, Inc. v. The Hawaiian Planter, 123 F.Supp. 394 (D. Or.1954); see The Victory & The Plymothian, supra; James McWilliams Blue Line, Inc. v. Card Towing Line, Inc., 168 F.2d 720 (2d Cir. 1948).

a collision if he had pursued a course further to [starboard] * * *. [T]he collision would not have taken place if the tug had been handled with reasonable care and skill."

■ The negligence of the tug was the proximate cause of the grounding of the tanker following the collision and the tug is solely responsible for the damage the tanker sustained by reason of the grounding. See Union Shipping & Trading Co. v. United States, 127 F.2d 771 (2d Cir. 1942); cf. Federal Insurance Co. v. S.S. Royalton, 328 F.2d 515 (6th Cir. 1964); The Algonquin, 70 F.2d 335 (2d Cir. 1934); compare The Asbury Park, 147 F. 194 (2d Cir. 1906; see generally The Baltimore, 75 U.S. (8 Wall.) 377, 19 L. Ed. 463 (1869). The weight of the flotilla was against the port side of the tanker and prevented the tanker from turning to port even though hard left rudder had previously been ordered. The action which was taken by Captain Mason after it appeared that there was a danger of collision was reasonable under all the circumstances.[8] See The Glendola, 47 F.2d 206 (2d Cir.), cert. denied, 283 U.S. 857, 51 S.Ct. 650, 75 L.Ed. 1463 (1931); The Walter A. Luckenbach, 14 F.2d 100 (9th Cir. 1926), cert. denied, 273 U.S. 741, 47 S.Ct. 335, 71 L.Ed. 868 (1927).

For the foregoing reasons, the Court finds the defendants solely responsible for the damage sustained by the tanker by reason of the collision and the grounding.

A hearing may be noticed to determine the amount of damages unless a showing is made that exceptional conditions justify a reference to a Commissioner (Rule 53(b), Federal Rules of Civil Procedure). In such event, the parties are invited to agree on a Commissioner and to submit his name for the Court's approval, or, if the parties are unable to agree, the Court will appoint a Commissioner.

Settle interlocutory decree in accordance with the foregoing.

It is so ordered.

8. Captain Mason attempted to avoid the collision by ordering the tanker's engines full ahead and by ordering right rudder. He testified that if he had not ordered right rudder, the stem of the tanker would have collided bow on with the NH 65 with the likelihood of greater damage to the tanker and the flotilla. After the collision, he continued with hard left rudder, attempting to prevent the tanker from going aground. Within a reasonable time after the collision, when it appeared that the tanker had not responded to the order for hard left rudder, Captain Mason ordered the engines full astern and dropped both anchors in an attempt to minimize the damage that would result from going aground.