**MARINE CONTRACTING AND TOWING CO., a South Carolina Corporation, Plaintiff,**

v.

**McMEEKIN CONSTRUCTION CO., a South Carolina Corporation, Defendant.**

**Civ. A. No. 68–986.**

United States District Court
D. South Carolina,
Charleston Division.

Aug. 1, 1969.

T. E. Pedersen, Charleston, S. C., for plaintiff.

Charles H. Gibbs, Sinkler, Gibbs & Simons, Charleston, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSION OF LAW, AND ORDER

DONALD RUSSELL, District Judge.

This is an action in Admiralty to recover damages sustained by a barge owned by the Plaintiff, when it struck an allegedly unmarked obstruction in the Ashley River, a navigable stream, near Charleston, South Carolina.

The Defendant is a contracting firm, organized as a corporation under the laws of South Carolina, which in this instance was engaged in the demolition of a railroad bridge over the Ashley River at the point where Plaintiff's barge sustained its damage under contract with the Seaboard Air Line Railroad Company. In the course of such work, it was alleged by the Plaintiff that the Defendant had negligently left unmarked in a navigable part of the river an underwater obstruction, which its barge struck in the course of navigating up the river, causing damage in the amount of $61,361.15 for which it sought judgment.

The Defendant denied any fault or negligence on its part contributing to Plaintiff's damages, and, by way of affirmative defenses, asserted both that Plaintiff's damages were due wholly to its own negligence and, alternatively, that there was mutual fault.

With issue thus joined, the cause came on for trial before me on May 15, 1969. After hearing the testimony and argument of counsel for the parties, I make the following Findings of Fact and Conclusions of Law in compliance with Rule 52, Federal Rules of Civil Procedure:

### FINDINGS OF FACT

1. For many years prior to 1968, the Seaboard Air Line Railroad (hereinafter called "Railroad") had maintained a trestle and drawbridge across the Ashley River, constructed under a permit duly issued by the Army Engineers. The portion of the bridge over the river itself rested on nine (9) piers, consisting of piles encased in concrete. The piers were designated by numbers. The pier numbered 1 was closest to the Charleston side of the river and was located on the river's east side. Pier 2 was 110 feet west of pier 1 and constituted the east rest pier for the swing draw span. Pier 3 was the pivot pier, supporting the drawbridge turntable and pier 4 was the west rest pier for the draw span. The drawbridge span, from pier 2 to pier 4 was 260 feet. Piers 5, 6, 7, 8 and 9 completed the support for the trestle across the west side of the river. Pier 5 was 110½ feet west of pier 4. Both rest piers and the center pivot pier were protected by fenders and dolphins, the dolphins generally being located channelward of the fenders.

The entire distance from the center of pier 1 to pier 9 was 902 feet. Pier 5 was 481 feet west of pier 1 or the eastern bank of the river, and 421 feet east of pier 9 on the western bank of the river. It was thus not far from being equidistant from both pier 1 and pier 9.

2. U. S. Coast and Geodetic Chart No. 470 corrected to January 29, 1968, was in effect on September 11, 1968. This

chart shows the river occupied by the railroad bridge and trestle and reflects the existence of a swing bridge with a horizontal clearance of 100 feet on each side of the pivot pier and a vertical clearance of 9 feet. It, also, gives the depth of the river between piers 1 and 9. It showed that the deepest portion of the Ashley River at the bridge site was west of pier 4, where it indicated a depth of 32 feet.

3. The chart's "dredged" channel at the point where the trestle was located apparently was the area between piers 2 and 4, but, while the bridge was standing, it seems to have been customary for pilots, when not meeting other ships, to favor the left-hand or west side of the drawbridge. In fact, the Defendant offered in evidence certain photographs that included a ship proceeding along such course up the west side of the old drawbridge area.

4. The only navigational aids in the area where the trestle had been are red buoys R6 and R8 on the east or Charleston side of the channel, and black day marker R10 far to the west and north of the channel of the river. Buoy 6 is about 600 yards south of the railroad bridge, Buoy 8 is about 400 yards north of the bridge, and Buoy 9, located as indicated, on the west side of the channel, is about 800 yards north of the trestle. While the trestle itself was in place, it constituted to some extent a navigational aid, since its fender and piling system indicated the dredged channel.

5. As a result of the consolidation of the Seaboard and Coast Line Railroads, it was determined to abandon the Railroad's trestle over the Ashley River; and, in the spring of 1968, a contract was entered into between the Railroad and the Defendant whereby the Defendant was to demolish and remove the railroad bridge including all piers and other obstructions connected therewith, entirely from the river. While requiring no formal permit for such demolition and removal, the Army Engineers notified by letter the Railroad and hence the Defendant that, incident to such removal,

it would be necessary to remove all portions of the bridge "to a depth of –32′ mlw (mean low water)". The contract between the Defendant and the Railroad also provided that, "The work is to be accomplished without interruption to river traffic. The Contractor shall make arrangements with the Corps of Engineers, Charleston District, for any temporary blockage or occupancy of the navigational channel, and shall arrange with local navigation interests for prior notification of approaching vessels in order to clear the channel for their passage." Under the original permit for the construction of the bridge and subsequent addition or repair permits, the Railroad was required to provide such navigational aids as required by the Coast Guard.

6. The Defendant proceeded promptly with the demolition of the bridge. It apparently began by removing first piers 2, 3 and 4 so as to clear the dredged channel. It then proceeded to other parts of the bridge. As of September 11, 1968, the demolition of all visible portions of the bridge from the bank on the west side of the river to the marsh line on the east side had been removed with the exception of a solitary dolphin where the old drawspan formerly was. This single remaining dolphin consisted of a cluster of seven or eight black creosoted piles and, though unmarked, was clearly visible in the river.

Pier 5 had not been completely removed at this time and some of its formerly concrete-encased piles were protruding above the mud line to a point approximately 11 feet below the surface, representing a submerged obstruction and hazard to all vessels drawing more than 11 feet. There were no buoys or warnings of any kind to indicate submerged obstructions in any part of the river's channel between what had formerly been piers 9 and 1. And at 3:30 p.m. on that date there were no work crews or floating demolition equipment at or near the bridge site. The weather was clear and there were no breaks in the water or other turbulence

to indicate any underwater obstruction around the site of the former bridge.

7. At about 3:30 p. m. on September 11, 1968, the tug "Admiral Dewey", towing along its starboard quarter the barge "Martoco #10", was proceeding, with a strong ebb tide running, north up the Ashley River over the area where the trestle had previously been. The tug was 95.7′ long, 21′ wide and 11.5′ deep. The barge was 178.1′ long, 38.1′ wide and 14.0′ deep. Both vessels were owned by and were being operated at the time by the Plaintiff.

The barge was loaded with creosote, which it was transporting to a point some distance beyond the spot where the trestle had been. So loaded, it drew 12′ of water with 1′ of freeboard.

The combined width of the tug and barge, proceeding in their normal course (which was at a slight sliding angle) was some 78 to 85 feet.

The tug "Admiral Dewey" was manned by a licensed captain, engineer, two deckhands, and a cook, and was equipped with a compass, U. S. Coast & Geodetic Chart No. 470 corrected to 1/29/68 (the latest chart), binoculars, radio and a pair of dividers, all constituting the usual and standard navigational equipment for tugs plying Charleston Harbor and tributaries. The tug captain had been up the Ashley River many times and was familiar with the structure of the bridge and its fender and dolphin system described above, as well as the depths shown on the Coast & Geodetic Chart, including the depth of the area where the barge stranded. He knew of the demolition work being carried out at the site of the old bridge but there was no evidence about the site on September 11, 1968, to indicate that such work was still in progress; indeed, all circumstances pointed to the conclusion that the removal of all obstructions, save for the plainly visible dolphin had been removed.

8. All navigation in these waters is by visual and/or line of sight methods.

The tug did not have aboard a pelorus for use by the pilot in locating his position in the river. However, a pelorus was not considered standard equipment for navigating the river and was not customarily used for such purpose. As stated above navigation at the points involved in this accident was customarily by visual or "eye-ball" method.

9. As the tug and barge were proceeding at a speed of about 3 miles per hour along the river at the site of the old trestle, the barge stranded upon the unmarked, submerged remains of the concrete-encased pier 5, which were not visible in any way to anyone on the tug. The depth at the point of stranding was such that, had there been no unmarked obstruction, the barge could have passed over such point easily without any damage and the tug and barge would at the time of the collision have been following a safe course up the river. The tug was able to pull the barge off with the tide; and it then proceeded north to the dock of the Koppers Company, where it unloaded the cargo aboard the barge. No damage was sustained to the cargo, but, though the barge was used the following day, the damage sustained by it was of such severity that the barge had to be drydocked and repaired. As a result, it was out of service for about three weeks.

10. The pilot of the tug, as he approached the site of the old trestle, saw the dolphin left in the river by the Defendant and assumed, it would seem, that it marked the position of the former pivot pier (pier 3). He was proceeding to the west of the same and at the time the barge stranded on the submerged remains of pier 5, the tug itself was some 25 to 40 feet west of pier 4, which, while the trestle stood, was the westward limit of the drawbridge span. The tug and barge, however, were at the time of the collision about midway of the channel and in an area where the depth, as shown on the current Coast and Geodetic Chart, was more than ample for the safe navigation of the tug and barge and where there were no markings or warn-

ings of underwater obstructions of any kind or indications of any demolition work in progress.

11. The damages claimed by the Plaintiff were $56,248. The actual repair costs to the barge were, by stipulation, $34,390.00. The tow boat company also claims $2,700 as an item of damages for other tugs of the same company standing by during the emergency; this is an item which necessarily includes some overhead since the tugs would have had to be manned at least on some sort of partial standby for regular use ·even if there had been no emergency, and for that reason I find the amount of loss for this item to be $1,500.00. The Plaintiff also claims $6,135.12 as damages for the loss of use of the barge, but this figure was the gross amount of projected barge rental or income and made no allowance for overhead and other items which would have resulted in a net figure. I find the loss due to this item to be $1,000.00. As to other items of damage claimed by the tow boat company, I find that they all arise from the temporary repairs performed on the barge prior to her drydocking and on the basis of the evidence, I fix this loss to the tow boat company at $2,594.03. If the tow boat company is entitled to recover its entire loss, I find the amount of the same to be $39,484.03.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this matter since it involves damages arising from an accident on the navigable waters of the United States and/or is covered by the Admiralty Extension Act, 46 U.S.C.A. § 740.

■ 2. The Defendant was negligent in leaving unmarked in a navigable part of the river an artificial submerged obstruction, not visible and not indicated by any turbulence or eddy, and in failing to provide any proper navigational guides or buoys for the benefit of mariners using such navigable stream at the point of such obstruction. The Defendant had removed all visible evidences of the trestle save for the clearly observable dolphin located near the previous pivot pier. It knew the depth of the entire channel. When it had thus removed all evidences of the trestle, it must have known that experienced pilots, cognizant of the depth of the channel and reasonably assuming from the failure of the Defendant to provide any warning of artificial submerged obstruction, that the entire channel of the river was safe for navigation, would use that part of the channel shown by the Geodetic Chart as safe for use. Particularly should the Defendant have recognized this, in view of the fact that, at the time of the stranding, there was no evidence of work about the trestle; there was no equipment present; indeed, everything indicated that the entire demolition work had been concluded and all parts of the channel of proper depth were safe for passage. Nor would the fact that a single dolphin, located about where the old pivot pier had been, was left visible, be inconsistent with this assumption; its maintenance would have been a natural one to provide a navigational guide. Under such circumstances, it was the plain duty of the Defendant to have placed warning buoys over the invisible submerged obstruction represented by the undemolished, underwater part of old pier 5. Its failure to do so was negligence.[1]

---

1. That the failure of one leaving an invisible obstruction in a navigable channel without marking its presence by appropriate warning buoys is negligence, see Whorton v. T. A. Loving & Company (C.C.A.N.C.1965) 344 F.2d 739, 746; Phila., Wil., and Balt. R. Co. v. Phil. and Havre de Grace Steam Towboat Co. (1859) 64 U.S. 209, 216, 23 How. 209, 16 L.Ed. 433; Casement v. Brown (1893) 148 U.S. 615, 623–624, 13 S.Ct. 672,

37 L.Ed. 582; Red Star Towing & Transportation Co. v. Snare & Triest Co. (C.C.A.N.Y.1912) 194 F. 672, 673; Consolidated Coal Co. v. Knickerbocker Steam T. Co. (D.C.Me.1912) 200 F. 840, 846–847; The Drill Boat No. 4 (D.C. Mass.1916) 233 F. 589, 596; Williams v. Edward Gillen Dock, Dredge & Const. Co. (C.C.A.Ohio 1919) 258 F. 591, 593: Kelley Island Lime & Transport Co. v. City of Cleveland (D.C.Ohio 1942) 47 F.

The Defendant would excuse its failure to provide suitable warning buoys by observing that it had demolished pier 5 to a point 11 feet below the surface and that such depth was sufficient for safe passage by the small craft which, under its contention, were the only vessels that should have been expected in the area. By this argument, the Defendant itself recognizes that, with all visible evidences of pier 5 removed, boats would normally use the area around old pier 5 as a part of the navigable channel. Its argument thus comes down to the contention that, while the area where the barge was stranded, was under the circumstances recognized by it as a part of the navigable channel of the river *but only for small craft.* Why merely for small craft? The Geodetic Chart shows the depth of the channel at old pier 5 to be 32 feet. Why should a barge such as that of Plaintiff, drawing only 12 feet, not safely use the navigable channel about old pier 5 and why should the Defendant not have recognized this? The Defendant cannot find excuse for its culpable failure to mark properly the obstruction it left submerged and invisible in the river because it assumed improperly and without reason that craft with a depth of more than 11 feet would not use what the Geodetic Chart showed was a safe course and passage for vessels twice such depth.

3. Neither the owner, tug captain, nor the crew of the tug and barge was negligent. The mere circumstance that the tug and barge were slightly west of the dredged channel is of no consequence. No rule of law requires navigation in the dredged channel.[2] While the trestle stood, of course, the passage was necessarily the area served by the drawbridge and, for this reason, was the dredged channel. When the trestle was removed, however, the area for proper and safe passage, as shown by the Geodetic Chart, was considerably enlarged to the west, where the depth was even greater than in the dredged channel. The fact that the dredged channel, which lay more to the east side of the river, was of less depth than the area to its west and required dredging indicates clearly that the eastern side of the river had silted more than the west side. For this reason, with the railroad bridge removed, the safer passage would have been in the area around and west of pier 4. So much the Defendant seemed to concede to the extent of small vessels. To limit the navigability of the area to small vessels is, as already observed, without justification. The depth about old pier 5 established its safe navigability for craft, whose operating depth was considerably greater than that of either the barge or the tug. Accordingly, but for the submerged and invisible obstruction left unmarked in the river by the Defendant, the pilot, at the time of the accident, would have been navigating in a proper way in a safe channel and his barge would have proceeded up the river without mishap.[3]

---

Supp. 533, 539; Corby v. Ramsdell (C.C.A.N.Y.1931) 48 F.2d 701, 703. The rule was well phrased in the *Corby* Case, *supra,*

"The libelant was entitled to the whole stretch of navigable water for the operations of his yacht, and the consideration that he was outside the channel, as surveyed by the government, would not in itself excuse the respondents for allowing the waters to be incumbered by a broken-down pier or for neglecting to mark the obstruction in such a way as to give warning to navigators."

2. American Dredging Co. v. Calmar S. S. Corp. (D.C.Pa.1954) 121 F.Supp. 255, 263, aff. 218 F.2d 823; Corby v. Ramsdell, *supra* (48 F.2d 701, 703).

3. Jones Towing, Inc. v. United States (D.C.La.1967) 277 F.Supp. 839, 848:

"A vessel is entitled to the full reach of a navigable stream available to the line of high water, including muds along the shore."

Moreover, the duty on the Defendant to mark submerged obstructions *is not limited* to the dredged channel but includes the entire navigable channel. Red Star

4. The tug captain, at the time of the stranding, was acting as lookout and his position provided adequate and proper lookout. No other lookout could have seen or observed the submerged obstruction.

It is argued that the Plaintiff knew that the bridge was being demolished and that, such demolition necessarily created a hazard, thereby imposing on the pilot of the tug and barge the duty to exercise great caution. In particular, the Defendant contends the operation of the tug and barge somewhat to the west of the dredged channel represented a failure to exercise such required caution. There are two answers to such contention. By removing the piers, the Defendant had removed the navigational markers that had theretofore indicated the dredged channel. Further, it took no steps to substitute other markers or warnings. Accordingly, it denied to mariners the opportunity to mark out precisely by visual operation the limits of the dredged channel. On the other hand, there would, of course, have been no need for such substitute markers, if the Defendant had discharged its duty and obligation to remove "completely" all invisible, underwater obstructions, created by the bridge pilings. In that event, the large area to the west of the dredged channel would have provided the tug and barge with a safe course, and the safe channel of the river, available for navigation, would have been substantially enlarged. Moreover, the Defendant's conduct gave the Plaintiff reasonable cause to assume that this was the case. At the time of the accident, so far as reasonable observation would indicate, the Defendant had completed its job and had removed all obstructions in the channel to a depth of 32 feet. It was safe to assume that the single dolphin remaining had been left as a navigational guide; and, since it was plainly visible, it represented no hazard. There was no work being done at the site of the removed bridge; there was no equipment evident; there were no representatives of the Defendant present; there were no buoys or warnings displayed. Under these circumstances, and from the absence of any "buoys in place, or other warning given", the pilot of the tug and barge had the right to "fairly conclude that all of these piers were so far submerged as to threaten no danger to passing boats." [4] But the *Defendant had not removed any obstructions* and it gave no warning or notice of their continued presence in what appeared to be a cleared channel. It was clearly negligent.

The pilot was not negligent or careless in following the courses he did. Relying on the appearances at the site of the old trestle and assuming, as he had a right to do, that the Defendant would have put out suitable warnings if the submerged obstructions had remained, he followed a course, which, by the Geodetic Chart, had a depth suitable for safe navigation by a ship of considerable more depth than either the barge or the tug. The tug and barge were not limited to the dredged channel; they were entitled "to the full reach of the navigable stream", as it was delineated as safe for boats of the depth of the tug and barge on the Geodetic Chart.[5]

Towing & Transportation Co. v. Woodburn (C.C.A.N.Y.1927) 18 F.2d 77, 78; Corby v. Ramsdell, *supra* (48 F.2d 701, 703).

See, also, Reading Co. v. Pope & Talbot, Inc. (D.C.Pa.1961) 192 F.Supp. 663, 665–666, aff. 295 F.2d 40, where the collision occurred when the libellant's vessel was some 175 to 200 yards outside the dredged channel though its pilot had thought erroneously he was within the dredged area. The operation without the dredged channel was not deemed negligent or faulty, since the place of the collision was of a depth sufficient for the ship's safe navigation and there is "no rule of law which required her to be navigated within the limits of the dredged channel." (p. 666.)

4. Casement v. Brown (1893) 148 U.S. 615, 626, 13 S.Ct. 672, 37 L.Ed. 582.

5. See Note 3.

Chesapeake Bay Bridge and Tunnel District v. Lauritzen (C.C.A.Va.1968) 404 F.2d 1001, is quite different from this case, so far as that decision finds fault in the libelant. In that case, all mariners were "advised that the tower (with which the vessel collided) was submerged" and, "with full knowledge" of that fact, the libelant "chose to stray" over into the threatened area where it knew the submerged tower was and out of the dredged channel. As has been pointed out, the pilot in this case not only did not know that the obstruction was in the area but, by the action of the Defendant, he had every reason to assume that there was no obstruction.

■ 5. Finally, the Defendant contends that the action of the pilot in piloting his tug and barge slightly to the starboard or left of the mid-channel violated the Narrow Channel Rule, Section 210, 33 U.S.C.A. It should be noted, though, that it is not clear just where the mid-channel was at the time of this accident. If it be accepted that the plaintiff had a right to assume, under all the circumstances and by reason of the complete failure of the Defendant to put out any warning markers, that the trestle and its underwater obstructions had been properly removed as Defendant's contract required (i.e., to a depth of 32 feet), then the navigable channel might be considered to extend from old pier 1 to old pier 9, or a distance of something over 900 feet. Under this assumption, the tug and barge would have been about midstream. Of course, the Defendant's position is that the channel must be assumed to be the area between old piers 4 and 2 and that the dolphin, which was left standing, marked the location of the former pivot pier. By reference to the standing dolphin, the pilot, according to the Defendant, should have realized that he was on the starboard side of the dredged channel. Even were this true, it would not justify a finding of negligence of the Plaintiff. The pilot was not passing any other vessel; in fact, the record would indicate that no other vessel was anywhere nearby. Whether the tug went to the right or the left of the remaining dolphin would not have created any hazard; at best, it would have merely created a condition.[6]

■ 6. The Defendant, also, places some reliance on the absence of a pelorus on board the tug, available for use by the pilot, as an element of negligence on the part of the Plaintiff. The evidence is uncontradicted, however, that it is not customary to use a pelorus in navigating the Ashley River and that the normal method of piloting is visual or "eye-ball". No one pointed out any hazards that would require the use of a pelorus in such navigation. The failure to have a pelorus aboard the tug or to use it in effecting passage over the site of the former bridge was therefore not negligence.[7] It is, of course, true that, if the pilot had had a pelorus aboard, he could, as he approached the site of the former trestle, have determined the exact location of the old piers and steered away from such locations. Absent any suitable buoys or other warning devices, the pilot had a right, however, to conclude that all submerged, artificial obstructions, created in the construction of the bridge, the "complete" removal of which the Defendant had obligated itself to effect, had been removed and it would have appeared an unnecessary act on his part to have used a pelorus to locate what he had a right to assume were the completed removed piers.

To summarize, I conclude:

(1) That the Defendant was negligent in leaving unmarked in a navigable part of the river an obstruction and in failing to provide any navigational guides

6. National Iranian Tanker Co. (Nederland), N. V. v. Tug Dalzell 2 (D.C.N.Y. 1968) 284 F.Supp. 451, 457.
   See, also, The Syosset (C.C.A.N.Y. 1934) 71 F.2d 666, 668; The Jemson No. 1 (D.C.N.Y.1941) 38 F.Supp. 493, 495, aff. 129 F.2d 618; Black Point S. S. Co. v. Reading Co. (D.C.Mass.1936) 14 F. Supp. 43, 45.

7. Reading Co. v. Pope & Talbot, Inc., *supra,* at p. 667 (192 F.Supp.).

to mariners using such navigable stream at the point of such obstruction.

(2) That such negligence was the proximate cause of the stranding of Plaintiff's barge;

(3) That the Plaintiff was not guilty of any negligence contributing to said stranding.

(4) That the Plaintiff is entitled to judgment against Defendant in the sum of $39.484.03.

And it is so ordered.